**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: BRENDON KEITH RETZ,
                                    *Debtor,*

BRENDON KEITH RETZ,
                                    *Appellant,*

v.

RICHARD J. SAMSON, Chapter 7
Trustee; DONALD G. ABBEY;
THOMAS TORNOW; AMERICAN
EXPRESS CENTURION BANK;
WHITEFISH CREDIT UNION; GLACIER
BANK OF WHITEFISH; UNITED STATES
TRUSTEE/GREAT FALLS,
                                    *Appellees.*

No. 08-60023

BAP No.
MT-07-1443-DJuPa

Bk. No.
04-60302-7-RBK

Adv. No.
05-00018

OPINION

Appeal from the Ninth Circuit
Bankruptcy Appellate Panel
Pappas, Dunn, and Jury, Bankruptcy Judges, Presiding

Argued and Submitted
March 3, 2010—Portland, Oregon

Filed June 4, 2010

Before: Richard A. Paez, Richard C. Tallman, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Tallman

8055

## COUNSEL

Ward E. Taleff (argued), Taleff Law Offices, P.C., Great Falls, Montana; Harold Dye, Dye & Moe, PLLP, Missoula, Montana, for debtor-appellant Brendon Keith Retz.

Michael G. Black (argued), Black Law Office, Missoula, Montana; Edward A. Murphy, Murphy Law Offices, PLLC, Missoula, Montana, for appellee Donald G. Abbey.

---

## OPINION

TALLMAN, Circuit Judge:

Debtor-Appellant Brendon Keith Retz ("Retz") filed for Chapter 7 bankruptcy on February 12, 2004. On March 8, 2005, Bankruptcy Trustee Richard J. Samson ("Trustee") and Retz's former business partner Donald G. Abbey ("Abbey"), along with several banks, filed this adversary proceeding in bankruptcy court seeking to stop Retz's discharge. After a five-day trial, the bankruptcy court found for the plaintiffs and denied Retz's discharge under 11 U.S.C. § 727(a)(2)(A), (a)(2)(B), (a)(4)(A), and (a)(5). Retz then appealed to the Ninth Circuit Bankruptcy Appellate Panel ("BAP"), which affirmed on all four grounds, any of which would have been sufficient to deny the discharge.

Retz now appeals, arguing that the bankruptcy court and BAP erred in denying him a general discharge because: (1) there is insufficient evidence of his intent to hinder, delay, or defraud his creditors because he relied in good faith on the advice of counsel in his actions during the bankruptcy proceeding; (2) any missing documents were easily obtainable by the Trustee; (3) one of the improper transfers did not involve an asset of the debtor; and (4) Retz's failure to file his tax returns was not his fault. We affirm the bankruptcy court's denial of Retz's discharge.

## I

Retz formed Timberland Construction, Inc. ("TCI") in 1994 soon after graduating from college with a degree in busi-

ness management. He was the sole shareholder of TCI, which performed development and construction work in the Whitefish, Montana, area. For the first few years of operations Retz kept the books for TCI and became proficient with the business's accounting software, Master Builder.

Abbey has been a successful California real estate investor for over thirty-five years. He has taken part in approximately 10,000 real estate transactions and has interests in over sixty companies. In 2001, Abbey decided to build a multi-million dollar residence in Montana (the "Shelter Island Project").[1] In order to maintain control of the construction process and save money on the project, Abbey decided to form a new construction and development company with Retz.

In early 2001, Retz and TCI entered into an oral agreement with Abbey to form Timberland Construction, LLC ("TCLLC"). TCLLC began operations in 2001. The TCLLC Operating Agreement, which had an effective date of July 1, 2001, was finalized and executed in March 2002 after extensive negotiations. Abbey and TCI were the governing members of TCLLC. The Operating Agreement provided that Abbey would contribute $300,000 to TCLLC, while TCI would contribute all its assets and liabilities. Abbey provided the first $100,000 in approximately March 2001 and provided the remaining $200,000 upon the execution of the Operating Agreement in 2002.

Abbey testified that he would not have provided the final $200,000, and in fact would have demanded the return of the original $100,000, if the Operating Agreement had not been signed. In contrast, Retz testified that Abbey told him the Operating Agreement was "only for the file," and that they did not actually have to operate within its parameters.[2] Abbey

---

[1]Shelter Island is located in Flathead Lake, approximately forty miles south of Whitefish, Montana.

[2]Retz admitted later that he thought the Operating Agreement was enforceable at least to the extent of the tax consequences of the transaction.

insists that he never told Retz that he did not have to abide by the terms of the Operating Agreement.

In May 2003, Abbey ran into Retz on the "comp" floor of the Bellagio Resort & Casino in Las Vegas, Nevada. Abbey testified that he was shocked that someone who earned only $40,000 a year had been given a complimentary room at the Bellagio, and became suspicious about Retz's behavior. He traveled to Montana in July 2003 and spoke with representatives at several local banks about Retz and TCLLC. Abbey discovered that TCLLC had entered into partnerships and loan agreements in violation of the Operating Agreement, which required Abbey's written permission.

In August 2003, Abbey brought William Matteson, an accountant with whom Abbey had worked in California, to Montana for the purpose of assessing TCLLC's financial condition and operations, ensuring Retz's compliance with the Operating Agreement, verifying that TCI had made the required contributions to TCLLC, and investigating a draft audit report prepared by Deloitte & Touche regarding potential overcharges on the Shelter Island Project. Matteson found numerous accounting irregularities in the TCLLC books and suspicious transfers between Retz and TCLLC. Retz testified that the transfers were short term loans that he made to TCLLC so that the company could meet its payroll obligations, followed by repayment of the loans. However, the loans and repayments were not clearly identified in the accounting system, and Matteson could not confirm that the amounts in and out of the business account matched. Due to Matteson's discoveries, Abbey began withdrawing financial support from TCLLC and shutting down the Shelter Island Project.

Soon thereafter, Retz learned that Abbey was planning to file litigation against him and decided to preemptively file a lawsuit against Abbey in state court. Abbey countersued Retz and his brother Ryan.[3] The state court appointed a receiver for

---

[3]Several members of the Retz family are involved in the events underlying this adversary proceeding. We refer to them by their first names to avoid confusion with the Debtor-Appellant Brendon Retz.

TCLLC, effective September 3, 2003. The state court litigation was stayed when Retz filed a voluntary Chapter 7 bankruptcy petition on February 12, 2004.

Following the filing of his bankruptcy petition, Retz filed what purported to be the required financial Schedules and Statement of Financial Affairs ("SOFA"). Retz acknowledged at trial that the Schedules and SOFA he filed were incomplete, but explained that he intended to amend them at some point, when he obtained additional information about his debts and assets. He attended the first Meeting of Creditors mandated by 11 U.S.C. § 341 ("§ 341 Creditors' Meeting") on March 19, 2004, and answered questions posed by the Trustee and the attending creditors. The second § 341 Creditors' Meeting took place on July 8, 2004. Retz again attended and answered some questions posed by the Trustee and other creditors.

On March 8, 2005, the Trustee and Abbey filed an adversary proceeding in bankruptcy court seeking denial of Retz's discharge pursuant to various subsections of 11 U.S.C. §§ 523 and 727. The bankruptcy court held a five-day trial, April 10 and 11, and June 1, 4, and 5, 2007. Many witnesses testified, including Retz, Abbey, the Trustee, Ryan, David Schultz (the Retz family accountant), Matteson, and Retz's bankruptcy attorneys Bruce Measure and Harold Dye. At the time of trial, nearly three years after Retz filed his bankruptcy petition, Retz still had not filed amendments to either the Schedules or the SOFA.[4]

In its written memorandum of decision the bankruptcy court found, "after observing [Retz's] demeanor while testifying under oath and cross examination, and examination of the

---

[4]Retz finally amended the Schedules and SOFA on August 7, 2007, after the end of the bankruptcy court trial. The amended Schedules and SOFA are, therefore, not part of the trial record in the adversary proceeding.

transcripts of the state court hearing . . . that [Retz] is not a credible witness." The court then denied Retz's discharge on four independent grounds: (1) Retz "knowingly and fraudulently, in or in connection with the case[,] made a false oath or account" on his Schedules and SOFA by failing to disclose income, assets, and transfers in violation of § 727(a)(4)(A); (2) Retz sold a house allegedly belonging to TCLLC to his brother Ryan for $60,000 under market value within one year before filing for bankruptcy, with the intent to hinder, delay, or defraud a creditor in violation of § 727(a)(2)(A); (3) Retz participated in the transfer, after the date of the filing of the bankruptcy petition, of North Forty Resort Corp. ("NFRC") assets to North Forty Resort, LLC, which greatly reduced the value of the bankruptcy estate's 6% ownership of the Corporation, with the intent to hinder, delay, or defraud a creditor in violation of § 727(a)(2)(B); and (4) Retz "failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet [his] liabilities" in violation of § 727(a)(5).[5] The BAP affirmed on all four grounds. Retz timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 158(d), and we affirm.

## II

We review decisions of the BAP de novo and apply the standard of review applied by the BAP to the bankruptcy court's decision. *Boyajian v. New Falls Corp. (In re Boyajian)*, 564 F.3d 1088, 1090 (9th Cir. 2009). The BAP reviewed the bankruptcy court decision in this case using the following standards:

---

[5]These statutory bases for denial correspond with the adversary proceeding's second amended complaint: Count 9 (false oaths), Count 13 (transfer of assets before filing), Count 14 (transfer of assets after filing), and Count 11 (failure to explain). The remaining counts under § 727 were dismissed. Counts 1 through 8 were brought under § 523; however, the bankruptcy court found it unnecessary to reach those counts because it denied Retz's discharge under § 727. Only § 727 is at issue in this appeal.

> (1) the [bankruptcy] court's determinations of the historical facts are reviewed for clear error; (2) the selection of the applicable legal rules under § 727 is reviewed de novo; and (3) the application of the facts to those rules requiring the exercise of judgments about values animating the rules is reviewed de novo.

*Searles v. Riley (In re Searles)*, 317 B.R. 368, 373 (B.A.P. 9th Cir. 2004) (relying upon *Murray v. Bammer (In re Bammer)*, 131 F.3d 788, 791-92 (9th Cir. 1997) (en banc)). A court's factual determination is clearly erroneous if it is illogical, implausible, or without support in the record. *United States v. Hinkson*, 585 F.3d 1247, 1261-62 & n.21 (9th Cir. 2009) (en banc) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 577 (1985)) (explaining that the clearly erroneous standard of review is an element of the clarified abuse of discretion standard).

Those objecting to discharge "bear[ ] the burden of proving by a preponderance of the evidence that [the debtor's] discharge should be denied." *Khalil v. Developers Sur. & Indem. Co. (In re Khalil)*, 379 B.R. 163, 172 (B.A.P. 9th Cir. 2007), *aff'd*, 578 F.3d 1167, 1168 (9th Cir. 2009) (expressly adopting the BAP's statement of applicable law). "In keeping with the 'fresh start' purposes behind the Bankruptcy Code, courts should construe § 727 liberally in favor of debtors and strictly against parties objecting to discharge." *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1281 (9th Cir. 1996). This does not alter the burden on the objector, but rather means that "actual, rather than constructive, intent is required" on the part of the debtor. *In re Khalil*, 379 B.R. at 172. When factual findings are based on determinations regarding the credibility of witnesses, we give great deference to the bankruptcy court's findings, because the bankruptcy court, as the trier of fact, had the opportunity to note "variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson*, 470 U.S. at 575.

## III

### A

**[1]** Section 727(a)(4)(A) states: "The court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case[,] made a false oath or account." 11 U.S.C. § 727(a)(4)(A). "A false statement or an omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath." *In re Khalil*, 379 B.R. at 172. "The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations."[6] *Id.* (quoting *Fogal Legware of Switz., Inc. v. Wills (In re Wills)*, 243 B.R. 58, 63 (B.A.P. 9th Cir. 1999)).

To prevail on this claim, a plaintiff must show, by a preponderance of the evidence, that: "(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently." *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (B.A.P. 9th Cir. 2005) (citing *In re Wills*, 243 B.R. at 62). A finding of fraudulent intent is a finding of fact reviewed for clear error. *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir. 1986).

### 1

**[2]** The first element that must be proven to deny discharge under § 727(a)(4)(A) is the existence of a false oath in connection with the bankruptcy case. *In re Roberts*, 331 B.R. at

---

[6]We note that this purpose is alone sufficient to rebut Retz's argument on appeal that the Trustee could have obtained the missing documents and tracked the missing funds on his own. Retz essentially dumped 28,000 pages of largely unorganized documents on the Trustee after repeated requests to explain his convoluted financial affairs. The Trustee should not have to conduct his own costly and ultimately fruitless investigation without the debtor's help.

882; *see also* 11 U.S.C. § 727(a)(4)(A). The bankruptcy court found numerous errors and omissions in Retz's Schedules and SOFA, which can qualify as false oaths under § 727(a)(4)(A). *See In re Khalil*, 379 B.R. at 172. The parties are familiar with the facts of the case and both the lengthy bankruptcy court opinion and the BAP opinion contain more complete discussions of the false oaths in the Schedules and SOFA. We discuss only some of the more significant errors and omissions here.

**[3]** There is no real dispute in this case that at the time Retz signed his incomplete Schedules and SOFA declaring, under penalty of perjury, that they were true and correct, he well knew that they were not true and correct. Retz admitted that he knew the Schedules and SOFA were incomplete when they were signed and filed, as did his attorney. Further, he did not even read the Schedules and SOFA before signing them.

Retz omitted from his Schedules valuable watches, a bank account, a 1984 Cadillac, a 2002 Audi purchased through TCI, and the sale of a helicopter and hangar. He also failed to list any income from 2003 or the beginning of 2004. Retz argues on appeal that he was unable to establish his income for 2003 and 2004 because TCLLC had yet to complete its tax returns for those years. As this issue is not dispositive, we have not considered the missing income information in our decision.

Retz conceded at trial that, three years later, he still had not made a complete response to the Trustee with respect to SOFA Question 3a, payments to creditors, Question 3b, payments to insiders, and Question 10, other transfers. Information that should have been listed in response to Question 3a includes the disclosure of Retz's prepayment of his home mortgage with the proceeds from the sale of his helicopter and hangar just before he petitioned for bankruptcy. In response to Question 3b, Retz should have listed at least two pre-petition transactions involving his father, Robert Retz: a

check to Robert dated March 17, 2003, for $38,287.30; and a check to Robert dated September 23, 2003, in the amount of $12,181.00.

There were also a series of transfers in September 2003 from Retz's credit cards to NFRC, a corporation owned and operated by the Retz family, totaling approximately $160,000. Retz later took this money from the NFRC account for his personal and business use, was advised by counsel that such an action was likely in violation of the credit card companies' merchant agreements, and paid the money back with the help of his father, who loaned him $80,000 to make up the amount that Retz had apparently already spent. Retz was unable to explain where the missing $80,000 went. He testified that he may have written a $30,000 check to himself, and that he "might have cashed it, or something." He also speculated that some of the money went into TCI for payroll and business expenses, while some of it likely went to his and his wife Misty's monthly expenses, which were high. The Trustee testified that to the extent these transfers might have been preferential, the failure to timely disclose them permitted the statute of limitation to run on the Trustee's ability to attempt to avoid those actions.

[4] As to Question 10, numerous contributions Retz made to, and distributions he received from, TCI and TCLLC were not listed. As discussed above, it was impossible to determine whether the amounts Retz had received from TCI and TCLLC matched the amounts he had provided to the companies. This evidence is sufficient to support the bankruptcy court's finding that Retz made false oaths on his Schedules and SOFA.

**2**

[5] Section 727(a)(4)(A) requires that the relevant false oath relate to a material fact. *In re Roberts*, 331 B.R. at 882; *see also* 11 U.S.C. § 727(a)(4)(A). "A fact is material 'if it bears a relationship to the debtor's business transactions or

estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property.' " *In re Khalil*, 379 B.R. at 173 (quoting *In re Wills*, 243 B.R. at 62). An omission or misstatement that "detrimentally affects administration of the estate" is material. *In re Wills*, 243 B.R. at 63 (citing 6 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 727.04[1][b] (15th ed. rev. 1998)).

**[6]** Retz's errors and omissions in his Schedules and SOFA related to his assets, property, and business dealings. Further, the Trustee testified that Retz's incomplete and erroneous Schedules and SOFA interfered with administration of the estate, making it almost impossible to reconstruct his financial affairs. The bankruptcy court correctly concluded that Retz's false oaths related to material facts.

### 3

**[7]** The third element required by § 727(a)(4)(A) is that the debtor act knowingly in making the false oath. *In re Roberts*, 331 B.R. at 882; *see also* 11 U.S.C. § 727(a)(4)(A). "A debtor 'acts knowingly if he or she acts deliberately and consciously.' " *In re Khalil*, 379 B.R. at 173 (quoting *In re Roberts*, 331 B.R. at 883). Retz deliberately and consciously signed the Schedules and SOFA knowing that they were incomplete. Furthermore, he admitted at trial that even if all the information from his worksheets had been included in the Schedules and SOFA they still would have been incomplete.[7] This is sufficient to support the bankruptcy court's finding that Retz acted knowingly.

### 4

Finally, the bankruptcy court found that Retz's fraudulent

---

[7]Retz's attorney acknowledged that some items that were listed in Retz's worksheets did not make it to the Schedules and SOFA through clerical error.

intent, establishing the fourth element of a § 727(a)(4)(A) violation, was shown "by a pattern of falsity, his reckless indifference to and disregard of the truth, and demonstrated by his course of conduct." Retz challenges this finding, arguing that he did not intend to defraud his creditors and that his good faith reliance on the advice of his counsel demonstrates his lack of fraudulent intent.

**[8]** To demonstrate fraudulent intent, Abbey and the Trustee bore the burden of showing that: "(1) [Retz] made the representations [*e.g.*, a false statement or omission in bankruptcy schedules]; (2) . . . at the time *he knew they were false*; [and] (3) . . . he made them with the *intention and purpose of deceiving the creditors*." *In re Khalil*, 379 B.R. at 173 *(quoting In re Roberts*, 331 B.R. at 884) (second and third alterations in original). Intent is usually proven by circumstantial evidence or by inferences drawn from the debtor's conduct. *Devers v. Bank of Sheridan, Mont. (In re Devers)*, 759 F.2d 751, 753-54 (9th Cir. 1985); *see also In re Roberts*, 331 B.R. at 884. Reckless indifference or disregard for the truth may be circumstantial evidence of intent, but is not sufficient, alone, to constitute fraudulent intent. *In re Khalil*, 379 B.R. at 173-75.

**[9]** "Generally, a debtor who acts in reliance on the advice of his attorney lacks the intent required to deny him a discharge of his debts." *In re Adeeb*, 787 F.2d at 1343. "However, the debtor's reliance must be in good faith." *Id.* The advice of counsel is not a defense when the erroneous information should have been evident to the debtor. *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 111 (1st Cir. 1987). "A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath." *Id.*

**[10]** Retz argues that he was unaware of many of the errors and omissions in his Schedules and SOFA because he signed the forms in blank and relied upon his attorney to fill in the

correct information. Retz cannot escape the bankruptcy court's finding of fraudulent intent by his reliance on the advice of his counsel. First, Retz's attorney, Harold Dye, testified that he did not advise Retz to sign the Schedules and SOFA without reading them. Retz's argument highlights the reason that the debtor is required to attest that he has read the Schedules and SOFA: to ensure to the greatest extent possible that the information turned over to the bankruptcy court is accurate. *See In re Searles*, 317 B.R. at 378 ("The continuing nature of the duty to assure accurate schedules of assets is fundamental because the viability of the system of voluntary bankruptcy depends upon full, candid, and complete disclosure by debtors of their financial affairs.").

[11] More importantly, the bankruptcy court explicitly found that Retz did not rely on Dye's advice in good faith. This finding is not clearly erroneous. The court properly noted that the significant number of falsehoods and omissions, together with the failure to amend the Schedules and SOFA in the three years between the petition and trial, can constitute reckless indifference to the truth, which is evidence of fraudulent intent. *See In re Khalil*, 379 B.R. at 173-75; *see also Martin Marietta Materials Sw., Inc. v. Lee (In re Lee)*, 309 B.R. 468, 477 (Bankr. W.D. Tex. 2004). The fact that Retz signed the forms in blank reflects this same reckless indifference to the truth, which adds to the circumstantial evidence of fraudulent intent. *See Kavanagh v. Leija (In re Leija)*, 270 B.R. 497, 504 (Bankr. E.D. Cal. 2001) (finding that signing of forms in blank was "at best, recklessly indifferent"). Considering the significant number of omissions and errors, the large monetary value of many of the omitted transfers, and the fact that Retz signed the Schedules and SOFA without reading them, the bankruptcy court's finding that Retz had the requisite fraudulent intent was not illogical, implausible, or without support in the record. *See Anderson*, 470 U.S. at 577.

[12] The bankruptcy court correctly held that Retz made many false oaths on his Schedules and SOFA, that the false

oaths related to material facts, and that they were made knowingly and fraudulently. *See* 11 U.S.C. § 727(a)(4)(A); *see also In re Roberts*, 331 B.R. at 882. We, therefore, affirm the bankruptcy court's denial of Retz's discharge pursuant to § 727(a)(4)(A).

**B**

**[13]** The bankruptcy court also denied Retz's discharge under both subsections of § 727(a)(2). That section states:

> The court shall grant the debtor a discharge, unless . . . the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed[,] (A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2). A party seeking denial of discharge under § 727(a)(2) must prove two things: "(1) a disposition of property, such as transfer or concealment, and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act [of] disposing of the property." *Hughes v. Lawson (In re Lawson)*, 122 F.3d 1237, 1240 (9th Cir. 1997).

A debtor's intent need not be fraudulent to meet the requirements of § 727(a)(2). Because the language of the statute is in the disjunctive it is sufficient if the debtor's intent is to hinder or delay a creditor. *In re Bernard*, 96 F.3d at 1281. Furthermore, "lack of injury to creditors is irrelevant for purposes of denying a discharge in bankruptcy." *Id.* at 1281-82 (quoting *In re Adeeb*, 787 F.2d at 1343).

In examining the circumstances of a transfer under § 727(a)(2), certain "badges of fraud" may support a finding of fraudulent intent.

> These factors, not all of which need be present, include (1) a close relationship between the transferor and the transferee; (2) that the transfer was in anticipation of a pending suit; (3) that the transferor Debtor was insolvent or in poor financial condition at the time; (4) that all or substantially all of the Debtor's property was transferred; (5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and (6) that the Debtor received inadequate consideration for the transfer.

*Emmett Valley Assocs. v. Woodfield (In re Woodfield)*, 978 F.2d 516, 518 (9th Cir. 1992).

## 1

The bankruptcy court held that Retz's sale of the house at 650 Woodside Lane, Whitefish, Montana, to his brother Ryan constituted a transfer of property, within one year prior to the filing of the bankruptcy petition, with an intent to hinder, delay, or defraud creditors sufficient to deny discharge under § 727(a)(2)(A). Retz argues that he arranged the sale more than a year before filing for bankruptcy and that he had no intent to defraud his creditors.

The facts surrounding the transfer of 650 Woodside are relatively complex and support the bankruptcy court's finding that Retz's actions regarding TCLLC, his creditors, and his properties evidenced Retz's fraudulent intent. Lot 6 of the Woodside subdivision, commonly referred to as 650 Woodside, was one of the properties that TCI should have contributed to TCLLC pursuant to Retz's business arrangement with Abbey and the TCLLC Operating Agreement. Retz testified

that although he did not transfer the deed from TCI to TCLLC, the property was placed on TCLLC's books in July 2001.

In the fall of 2001, once construction was finished on the house, Retz and Misty moved into 650 Woodside. They did not pay rent. Retz testified that he spoke with Abbey about paying rent and Abbey allegedly told him not to worry about it, stating: "Don't be ridiculous. Just put a cup at the back door and stick a quarter in it for your uncle Don every now and then." Abbey testified to the contrary that he told Retz that the house should be sold for a profit and that if Retz wanted to live in it, he should pay rent.

On July 3, 2002, TCI—not TCLLC, the purported owner of the property—deeded 650 Woodside to Retz and Misty. Retz explained that he exchanged 650 Woodside, at cost, for a piece of property across the street that he owned personally, 665 Woodside. Later, Retz and Misty decided they wanted to build a house at 665 Woodside so they purchased it back from TCLLC at the same price for which it had been exchanged a few months before. Retz testified that Abbey verbally consented to the transfer of 650 Woodside. However, he concedes that Abbey never consented in writing, as required by the Operating Agreement. Abbey testified that he had no knowledge of the transfer until long after it was complete.

The bankruptcy court found that Abbey did not tell Retz he could live at 650 Woodside without paying rent and that Abbey had not consented to the transfer of 650 Woodside from TCLLC to Retz. In rejecting Retz's version of the facts, the bankruptcy court observed that the "testimony by [Retz] regarding Abbey's nonchalance about his business affairs is fantastic, and wholly inconsistent with the evidence of Abbey's business practices in dozens of companies." The bankruptcy court also noted that Retz's testimony that the two men had a verbal agreement not to abide by the Operating

Agreement was in direct contradiction to the Agreement's integration clause.[8]

In May 2002, Retz invited his brother Ryan to move back to Whitefish from Boise, Idaho, to work for TCLLC. As an inducement for Ryan to accept the job, Retz promised to sell him 650 Woodside for a good price. Ryan moved into 650 Woodside in July 2003. Retz ordered an appraisal so that Ryan could secure financing; the appraised value as of July 25, 2003, was $220,000. Retz and Ryan then executed a buy-sell agreement for 650 Woodside in November 2003, which they backdated to July 20, 2003. The sale price was $160,000.

The bankruptcy court made several adverse findings of fact relating to the sale of 650 Woodside. First, the court found that the sale was within one year of Retz filing his petition for bankruptcy, relying on the date of the buy-sell agreement, rather than the date Retz told Ryan he could get him a good deal on the house. Relying on the date of the buy-sell agreement is rational and supported by the record, particularly because the bankruptcy court found Retz's testimony generally not credible. Second, the bankruptcy court held that the sale was unquestionably a transfer within the meaning of § 727(a)(2). Retz does not appear to challenge this finding on appeal. Third, the court described four badges of fraud present in the transaction: that Retz (1) had a close relationship with the transferee, Ryan; (2) sold the house during pending state court litigation involving one of his most significant creditors, Abbey; (3) was in poor financial condition at the time of the sale; and (4) received inadequate consideration by selling the house for $60,000 less than the appraised value. *See In re Woodfield*, 978 F.2d at 518.

---

[8]The integration clause reads: "This Agreement and the other written agreements entered into concurrently herewith constitute the complete and exclusive statement of agreement among the Members and Governing Members with respect to the subject matter herein and therein and replace and supercede all prior written and oral agreements or statements by and among the Members and Governing Members or any of them."

Retz's reliance on attorney Dye's advice that the sale was legally proper is insufficient to vitiate the fraudulent intent evidenced by these badges of fraud. Dye testified that Retz told him the state court had authorized the sale to go forward, but Retz failed to tell Dye that the state court did not know that the sale was to Retz's brother for $60,000 under market value. Furthermore, although Dye was aware that Ryan was purchasing 650 Woodside, he did not know that it had been appraised at $60,000 over the sale price. Reliance on the advice of counsel is not a viable defense to a claim of fraud when the debtor has not made full disclosure of the relevant facts to counsel. *See Adell v. John Richards Homes Bldg. Co. (In re John Richards Homes Bldg. Co.)*, 439 F.3d 248, 260 (6th Cir. 2006) ("[A] client reasonably relies on an attorney's advice only when the client provides to the attorney all of the pertinent facts in the client's possession."). The bankruptcy court's decision is also supported by Retz's lack of candor with the state court and with his own attorney regarding the sale of 650 Woodside, which is further evidence of his fraudulent intent.

**[14]** The bankruptcy court's determination that the sale of 650 Woodside was a transfer within a year before filing for bankruptcy, made with the intent to hinder, delay, or defraud a creditor is not clearly erroneous. The record demonstrates that Retz improperly purchased 650 Woodside from TCLLC for cost, rather than selling it for profit to benefit the business. He then sold it to his brother for $60,000 under market value only a few months before he filed for bankruptcy. Retz failed to inform the state court investigating the propriety of the transfer of 650 Woodside that the arranged sale was to his brother for well below market value. It is hard to believe that an educated and experienced business owner like Retz would have found this information irrelevant to the state court's concerns regarding TCLLC's financial losses related to the house. Retz also failed to tell his attorney that the sale was for well below market value. This evidence supports a finding of fraudulent intent in the transfer of 650 Woodside, and we

affirm the bankruptcy court's denial of Retz's discharge under § 727(a)(2)(A).

**2**

The bankruptcy court also denied Retz's discharge under § 727(a)(2)(B) due to his participation in the transfer of NFRC assets belonging to the bankruptcy estate, without notice to the Trustee, with the intent to hinder, delay, and defraud creditors.

The Retz family owned a bed and breakfast resort called North Forty Resort, which was owned by NFRC. Retz's parents, Robert and JoEllen, owned 82% of NFRC, and Retz, Ryan, and their brother Eric each owned 6%. Retz was a director and vice president of NFRC from its inception in 1993. When they first opened the resort, Retz performed the bookkeeping, maintained the ledger, wrote checks, paid bills, and compiled financial statements and balance sheets for its operation. Although he claimed that he later had no role in the finances of the resort, Retz had access to NFRC's bank accounts in September 2003 when he removed cash from the accounts for his personal use.

On July 6, 2004, the Trustee requested by letter that Retz provide him with information regarding NFRC. Retz responded more than three months later in a letter dated October 27, 2004, that the Trustee's request was very broad and that he would respond only to more specific questions the Trustee might have about NFRC. In the interim, NFRC sold all of its assets on September 17, 2004, to North Forty Resort, LLC. Retz's mother, JoEllen, is the sole member of North Forty Resort, LLC. As a result of the transfer, NFRC now holds as its only asset a promissory note in the amount of $850,000, payable in thirty years with interest at 6%. The Trustee learned of the transfer on September 20, 2004, even though the estate held Retz's 6% of NFRC, and should have been consulted before the transfer.

Retz and several of his family members testified that the purpose of the NFRC sale was to protect his father's capital loss carryover that would be lost on his father's death. Because Robert was suffering from terminal cancer, the time for completing the transfer was necessarily short. However, the Retzes did hire an accountant, David Schultz, to advise them regarding the transfer. Schultz prepared a draft document discussing the financial and tax goals of the Retz family related to the transfer. At trial, he testified that Retz was involved in the discussions regarding the memorandum. One of the listed goals of the transfer was to: "Minimize exposure to possible creditors of Brendon that survive the bankruptcy."

The bankruptcy court acknowledged that the transfer of the NFRC assets included a legitimate purpose, preserving Robert's tax loss benefits. However, the court stated that Retz's 6% interest in NFRC was unquestionably property of the estate and the sale was a disposition of property.

Finally, the court found that Retz had the requisite intent to hinder, delay, or defraud his creditors. Both Schultz and Eric testified that Retz was involved in the discussions leading up to Schultz's memorandum, which listed as a goal of the transfer minimizing NFRC's exposure to Retz's creditors. The court found that this goal alone was sufficient to satisfy the intent requirement.

The bankruptcy court also found that Retz's delay in responding to the Trustee's questions regarding NFRC and his evasiveness in giving the Trustee full information regarding NFRC was evidence of fraudulent intent. The court found three badges of fraud in the NFRC transaction: (1) Retz's close relationship with the transferee, an entity owned and controlled by his mother; (2) the transfer occurred during the pendency of Retz's bankruptcy; and (3) Retz was insolvent at the time of the transfer. *See In re Woodfield*, 978 F.2d at 518.

[15] Retz presents several arguments on appeal contesting the bankruptcy court's findings. First, Retz argues that he was

not involved in the transfer of the NFRC assets, which was spearheaded by his father Robert. Second, he contends that it was NFRC's attorney, not Retz, who had a duty to inform the Trustee, a minority shareholder, of the sale. Third, Retz states that the Trustee lost no value after the transfer because NFRC retained assets equal in value to those it transferred. Finally, he argues that he no longer held an interest in NFRC at the time of the transfer because the shares belonged to the estate. This argument appears to relate to the requirement under § 727(a)(2) that the relevant property have been transferred. However, as discussed more fully below, § 727(a)(2)(B) specifically governs transfers of property belonging to the estate.

[16] Retz's effort to disclaim responsibility for the transfer is unavailing. Two witnesses testified that Retz was involved in planning the transfer with his father. Only Retz's self-serving testimony rebutted the adverse evidence presented at trial. The bankruptcy court found his testimony not credible, and we give great deference to the bankruptcy court's determinations regarding the credibility of witnesses. *See Anderson*, 470 U.S. at 575. The evidence, thus construed against him, supports the bankruptcy court's determination that Retz was involved in the transfer.

[17] Regarding Retz's responsibility to inform the Trustee of the transfer of NFRC assets, it is true that NFRC's attorney likely had a duty to inform the Trustee, as a minority shareholder, of the transfer. However, the Trustee had specifically asked Retz for information regarding NFRC, which Retz failed to provide in a timely fashion. As a debtor in bankruptcy proceedings, Retz had a duty to share full information with the Trustee, completely separate from any duty owed to the Trustee as a minority shareholder. *See generally Grogan v. Garner*, 498 U.S. 279, 286-87 (1991) (stating that the Bankruptcy Act "limits the opportunity for a completely unencumbered new beginning to the honest but unfortunate debtor" (internal quotation marks omitted)); *see also In re Wills*, 243 B.R. at 63 ("[T]he opportunity to obtain a fresh

start is . . . conditioned upon truthful disclosure." (quoting *Aubrey v. Thomas (In re Aubrey)*, 111 B.R. 268, 274 (B.A.P. 9th Cir. 1990))). Further, Retz's failure to inform the Trustee of the transfer is circumstantial evidence of his intent to hinder, delay, or defraud creditors, because there is no other reasonable explanation for Retz's delay.

Retz's argument that the Trustee lost no value as a result of the transfer of NFRC's stock is unrelated to whether there was a transfer and whether Retz intended to hinder, delay, or defraud the Trustee and his creditors by engaging in the transfer. Furthermore, "lack of injury to creditors is irrelevant for purposes of denying a discharge in bankruptcy."[9] *In re Bernard*, 96 F.3d at 1281-82 (quoting *In re Adeeb*, 787 F.2d at 1343).

Finally, Retz's statement that he no longer owned an interest in NFRC and that the transfer, therefore, cannot be held against him, is nonsensical. Section 727(a)(2)(B) allows a court to deny discharge when a debtor "has permitted to be transferred . . . property of the estate." 11 U.S.C. § 727(a)(2). Thus, it makes no difference that the NFRC stock belonged to the estate, rather than to Retz. Retz can be held responsible for any transfer of that property that is accomplished in order to hinder, delay, or defraud the Trustee or a creditor.[10] *See id.*

---

[9]The transfer likely did cause NFRC's stock to lose value, because the only property held by NFRC after the transfer was an unsecured promissory note on which no principal payment was due for thirty years, and on which interest was due, beginning at the end of the sixth year, "only as Buyer's net profits allow."

[10]A single sentence in Retz's opening brief on appeal implies that the transfer of NFRC's assets to the North Forty Resort, LLC, was not a transfer of property under *Hansen v. Moore (In re Hansen)*, 368 B.R. 868 (B.A.P. 9th Cir. 2007). The only explication of this argument is that "*Hansen* did not hold a transfer of the assets of a corporation in which a debtor is a minority shareholder is a transfer of the debtor's property." The fact that *Hansen* dealt with a different factual scenario than the current case is hardly support for an argument that there was no transfer of assets in this

**[18]** Considering all the evidence presented at trial regarding the transfer of NFRC assets, the bankruptcy court's finding that Retz intended to hinder, delay, or defraud his creditors by completing the transfer is not illogical, implausible, or without support in the record. *See Anderson*, 470 U.S. at 577.

## C

**[19]** The final ground upon which the bankruptcy court rested its denial of Retz's discharge is § 727(a)(5). Section 727(a)(5) states: "The court shall grant the debtor a discharge, unless . . . the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5).

> Under § 727(a)(5) an objecting party bears the initial burden of proof and must demonstrate: (1) debtor at one time, not too remote from the bankruptcy petition date, owned identifiable assets; (2) on the date the bankruptcy petition was filed or order of relief granted, the debtor no longer owned the assets; and (3) the bankruptcy pleadings or statement of affairs do not reflect an adequate explanation for the disposition of the assets.

*Olympic Coast Invest., Inc. v. Wright (In re Wright)*, 364 B.R. 51, 79 (Bankr. D. Mont. 2007); *see also In re Devers*, 759 F.2d at 754 (concluding that debtors could be denied discharge under § 727(a)(5) where they failed to offer a "satis-

---

case. In fact, the briefing itself describes the actions taken by NFRC as a transfer of assets. We are satisfied, based on the facts found by the bankruptcy court, that Retz was sufficiently involved in the transfer of the NFRC assets for this transaction to qualify as a disposition of estate property under § 727(a)(2).

factory explanation" for the "disappearance" of a tractor they had owned that they did not produce for repossession). Once the creditor has made a prima facie case, the debtor must offer credible evidence regarding the disposition of the missing assets. *In re Devers*, 759 F.2d at 754.

Whether a debtor has satisfactorily explained a loss of assets is a question of fact for the bankruptcy court, overturned only for clear error. *Hawley v. Cement Indus., Inc. (In re Hawley)*, 51 F.3d 246, 248 (11th Cir. 1995) (per curiam) (citing *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir. 1984) (per curiam)). "A debtor's failure to offer a satisfactory explanation when called on by the court is a sufficient ground for denial of discharge under [§] 727(a)(5)." *In re Devers*, 759 F.2d at 754.

The inadequacy of Retz's Schedules and SOFA is discussed above. In particular, large amounts of money were transferred into and out of Retz's personal bank accounts, and he very rarely had any explanation for where the money went. There is also evidence in the record that Retz went on a spending spree just before filing for bankruptcy to benefit both himself and TCI, purchasing computers, office furniture, servers, luxury cars, a helicopter and hangar, and making gambling trips where he lost thousands of dollars. The purchases for TCI are particularly troubling, because Retz indicated at the first § 341 Creditors' Meeting that the company was essentially inactive once his business relationship with Abbey broke down. Furthermore, after describing the purchases made on behalf of TCI at trial, Retz stated that he did not know where excess loan proceeds and credit card funds purportedly used to effect these purchases went.

Retz argues that he should not be penalized for the lack of records because all the documents were in the hands of the Receiver or Trustee, or were readily obtainable by them. Retz is essentially contending that the Trustee is obligated to investigate complex financial transactions and unfinished books

without any help from the debtor. He also implies that he was unable to obtain documents held by the Receiver and Trustee. However, he had the right to compel production of any necessary documents under Federal Rule of Bankruptcy Procedure 2004(c).

[20] Retz fails to explain how the Trustee should have found the relevant information, if Retz himself was unable to discover it in the 28,000-plus pages of records he provided to the Trustee. "A petitioner cannot omit items from his schedules, force the trustee and the creditors, at their peril, to guess that he has done so—and hold them to a mythical requirement that they search through a paperwork jungle in the hope of finding an overlooked needle in a documentary haystack." *In re Tully*, 818 F.2d at 111. As the BAP so succinctly noted, "In the end, there simply is no basis in the voluminous but nevertheless woefully incomplete record before the bankruptcy court from which *anyone* could explain satisfactorily Retz's deficiency of assets to meet his liabilities. Retz certainly has not done so." The record amply supports the judgment entered against Retz.

## IV

The decision of the bankruptcy court and the BAP to deny Retz's discharge is **AFFIRMED.**