**NOT FOR PUBLICATION**

FILED

AUG 02 2017

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | BAP No.   CC-16-1136-KuLTa |
| ROGER BERNARD McCLAIN, | Bk. No.   1:14-bk-10041-VK |
| Debtor. | Adv. No.  1:14-ap-01058-VK |
| ROGER BERNARD McCLAIN, | |
| Appellant, | |
| v. | **MEMORANDUM**[*] |
| CROWN COACHWORKS, INC., | |
| Appellee. | |

Argued and Submitted on June 22, 2017
at Pasadena, California

Filed – August 2, 2017

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Victoria S. Kaufman, Bankruptcy Judge, Presiding

Appearances:     Neil C. Evans argued for appellant; Martin R.
Berman of the Law Offices of Pflaster & Berman
argued for appellee.

Before: KURTZ, LAFFERTY and TAYLOR, Bankruptcy Judges.

     [*]This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may
have (see Fed. R. App. P. 32.1), it has no precedential value.
See 9th Cir. BAP Rule 8024-1.

**INTRODUCTION**

Chapter 7[1] debtor Roger Bernard McClain appeals from a judgment after trial excepting from discharge under § 523(a)(4) the judgment debt he owes to his former employer, Crown Coachworks, Inc. On appeal, McClain contends that there was insufficient credible evidence that he embezzled any funds from Crown.

Applying, as we must, the clearly erroneous standard of review to the bankruptcy court's findings of fact, we cannot say that the court committed reversible error when it inferred from the trial evidence that McClain took 47 insurance company checks payable to Crown and gave them to his friend Mariah Diaz so that she could cash them for her own purposes and benefit. As found by the bankruptcy court, Crown had entrusted the insurance checks to McClain for the sole purpose of having McClain process the checks for deposit into Crown's bank account. The bankruptcy court concluded that McClain deceitfully took the checks and used them for a purpose other than that for which Crown had entrusted them to him.

These findings were adequately supported by the record, and the findings were sufficient for the court to rule in Crown's favor on its § 523(a)(4) claim for relief. Accordingly, we AFFIRM.

---

[1]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

**FACTS**

Crown is a corporation that owned and operated an automobile body repair shop located on the west side of Los Angeles. Jacob Dunkel founded Crown in the early 1990s with Ronald Gross. Dunkel shared ownership of Crown with Gross until 2002 or 2003, when Dunkel became the sole owner.

At the time relevant to the parties' dispute, Crown operated out of two adjoining properties: one referred to as the "north building," where the auto body repair work took place, and the other referred to as the "south building," where Crown's main office was situated. Dunkel – whose expertise was in automobile repair – alleged that he generally spent time in the north building. McClain disputed this point, saying that Dunkel spent most of his time in the main office sitting across from him.

Before his departure, Gross ran the "office" portion of Crown's business, which included serving as an "estimator." According to both parties, an estimator is someone who met with the customers and insurance adjusters, made a written assessment of the type of work that needed to be done, and estimated the cost of the work.

In the mid-1990s, Crown hired McClain as an additional estimator; he initially worked with Gross in the main office. After Gross left in 2002 or 2003, until McClain quit in 2005, McClain was the only estimator and also served as the office manager.

One of McClain's tasks was receiving cash, checks and credit cards from customers and insurance companies. The vast majority of Crown's work was insurance work, and the insurance companies

3

almost always paid by check. Checks typically were handled in the following manner: either McClain or Dunkel would open the mail, then the checks would be segregated, then the checks would be placed in a drawer in Dunkel's desk, and then one or the other of them would fill out a deposit slip and make the deposit. A copy of each check was made and kept in the customer file. No one else handled the checks to be deposited. Checks for deposit always were stamped with Crown's customized endorsement stamp, which endorsed the checks for deposit in Crown's sole bank account.

However, certain insurance checks made payable to Crown ended up being cashed. The underlying litigation concerns roughly 47 cashed insurance company checks. These 47 cashed checks all were endorsed with a handwritten signature, and most appear to include the same telephone number just below the endorsement signature. While the check copies are of exceptionally poor quality, McClain identified the endorsement signature on at least some of them as that of Mariah Diaz. He also identified the phone number as belonging to Diaz or her brother.

Neither side disputes that Diaz cashed these 47 insurance checks. The real dispute concerns how Diaz obtained possession of the checks and for what purpose. Diaz was not an employee of Crown; she rented space from Crown for her auto detail business. In exchange for the rental space, Diaz provided "free" auto detailing services for cars that Crown was working on. But this arrangement only lasted for roughly eight months. After this arrangement ended, Diaz had no other apparent connection to Crown

4

– other than the fact that her name and phone number were endorsed on the back of 47 insurance checks payable to Crown, spanning the course of a two-year period, between 2003 and 2005.

McClain admits that, after Gross left Crown, he sometimes would give checks to Diaz to cash at a local check cashing agency, in 2003 and 2004. But he maintained that, when he gave checks to Diaz, he was following Dunkel's direction and that Dunkel always received the cash proceeds. According to McClain, he frequently witnessed Diaz cashing checks for Dunkel and returning the cash to Dunkel. Another former employee of Crown, Samuel Key, testified that, in 2005, shortly after he came to work at Crown as McClain's replacement, Dunkel spoke to him about Crown's check cashing practices. According to Key, Dunkel told him he sometimes had others cash checks made payable to Crown on his behalf - including Diaz. Around the same time, Dunkel supposedly asked Key to take an insurance check and cash it at a local check cashing business, but Key refused.

According to McClain, when he left Crown in 2005 to go work for a competitor, he thinks Dunkel was angry at him for leaving; McClain suggests that this might be why Dunkel accused him of misappropriating the 47 insurance checks.

But Dunkel told a much different story. He testified that insurance checks were supposed to be deposited in Crown's bank account and that he never asked or authorized anyone at Crown to cash insurance checks for him – at any check cashing agency or elsewhere. The thrust of Dunkel's testimony is that McClain misappropriated the 47 insurance checks by giving them to Diaz so that she could cash them for her or their own purposes.

5

Crown sued McClain and others in state court for (among other things) conversion, fraud and money had and received. Crown settled the lawsuit with McClain in May 2008 by entering into a stipulation for entry of judgment. The stipulation required McClain to pay Crown $25,000 over three years, in monthly installments. If McClain timely made all the required payments, then Crown was required to dismiss the lawsuit with prejudice. However, McClain defaulted on his settlement payment obligations after eleven months of payments. Consequently, pursuant to the terms of the stipulation for entry of judgment, the state court entered judgment against McClain in the amount of $56,049.25. It is this judgment debt that Crown's nondischargeability complaint sought to except from discharge.

After two days of testimony and closing argument, in April 2016, the bankruptcy court issued a written statement of decision in which it held that Crown had not proven by a preponderance of the evidence its claims under §§ 523(a)(2)(A), 523(a)(6) or 727(a)(4). In addition, the bankruptcy court determined that the state court stipulated judgment only was entitled to preclusive effect as to the amount of debt McClain owed Crown. Crown did not cross appeal any of these rulings.

On the other hand, the bankruptcy court found in favor of Crown on its § 523(a)(4) claim for relief, holding that Crown had proven, by a preponderance of the evidence, that McClain had embezzled the 47 insurance checks.

On May 2, 2016, the bankruptcy court entered judgment against McClain excepting his $56,049.25 judgment debt from discharge and awarding Crown pre- and post-judgment interest.

6

McClain timely appealed.

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I) and (J), and we have jurisdiction under 28 U.S.C. § 158.

**ISSUE**

Did the bankruptcy court commit reversible error when it ruled in favor of Crown on its § 523(a)(4) embezzlement claim?

**STANDARDS OF REVIEW**

We review the bankruptcy court's findings of fact under the clearly erroneous standard and its conclusions of law de novo. Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 28 (9th Cir. BAP 2009), aff'd, 407 F. App'x 176 (9th Cir. 2010).

**DISCUSSION**

In relevant part, § 523(a)(4) excepts from discharge debts arising from embezzlement. We look to federal law instead of state law for the meaning of the term "embezzlement" for purposes of § 523(a)(4). First Del. Life Ins. Co. v. Wada (In re Wada), 210 B.R. 572, 576 (9th Cir. BAP 1997). To find that an embezzlement has occurred for nondischargeability purposes, the bankruptcy court must find: (1) that the debtor rightfully was in possession of property as a nonowner, (2) that the debtor appropriated (used) the property for a purpose other than for which it was entrusted; and (3) "circumstances indicating fraud" Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton), 942 F.2d 551, 555 (9th Cir. 1991); In re Wada, 210 B.R. at 576.

The type of conduct necessary to satisfy the third

7

embezzlement element – circumstances indicating fraud – need not include a misrepresentation or any other particularized type of fraud identified in § 523(a)(2)(A).  Phillips v. Arnold (In re Phillips), 2016 WL 7383964, at *5 (Mem. Dec.) (9th Cir. BAP Dec. 16, 2016) (citing Husky Int'l Elecs., Inc. v. Ritz, 136 S. Ct. 1581 (2016)).  When the debtor attempts to conceal the misappropriation or to deceive the creditor regarding the misappropriation, evidence of such concealment or deception can satisfy the "circumstances indicating fraud" element.  PMM Invs., LLC v. Campbell (In re Campbell), 490 B.R. 390, 402 (Bankr. D. Ariz. 2013);  Bello Paradiso, LLC v. Hatch (In re Hatch), 465 B.R. 479, 487-90 (Bankr. W.D. Mich. 2012); see also In re Phillips, 2016 WL 7383964, at *5 ("The record here sufficiently establishes misconduct that falls within the broader definition of actual fraud and even more plainly meets the § 523(a)(4) requirement of indicia of fraud.").

The bankruptcy court correctly recited and applied the above-referenced law governing embezzlement under § 523(a)(4). The only genuine issue presented by this appeal is whether the record supported the bankruptcy court's finding that McClain had misappropriated the 47 insurance checks.

In its statement of decision, the bankruptcy court offered a careful and detailed assessment of the evidence supporting its misappropriation finding.

First and foremost, the bankruptcy court found that only Dunkel and McClain had access to the incoming checks and that cashing insurance checks was not in Crown's "ordinary course of business."  These findings were consistent with Dunkel's

8

testimony that he never cashed insurance checks, that he never directed anyone else to cash insurance checks and that only he and McClain ever handled insurance checks.

McClain argues that Dunkel's testimony was not credible. McClain complains that, throughout the trial, Crown's counsel asked Dunkel leading questions designed to elicit from Dunkel specific, desired answers rather than truthful answers. According to McClain, Dunkel answered these questions in accordance with how he thought his counsel wanted him to answer them, instead of based on his actual knowledge or recollection. Having reviewed the trial record, we assume and acknowledge that the manner of Crown's counsel's direct examination of Dunkel might, at times, have diminished the credibility of some of Dunkel's testimony. However, on the critical points – the major points in dispute regarding how Crown processed incoming insurance checks and what McClain was authorized to do with these insurance checks – Dunkel repeatedly was asked the same questions in several different ways (by both counsel) and Dunkel's testimony always was consistent and unequivocal: Crown never cashed insurance checks, Dunkel never asked anyone to cash insurance checks and only he and McClain handled checks for deposit.

Therefore, the bankruptcy court did not commit reversible error when it permitted Crown's counsel to ask Dunkel leading questions. The bankruptcy court had broad discretion in deciding the extent to which leading questions were necessary to help develop Dunkel's testimony. Fed. R. Evid. 611(c); see also accompanying Advisory Committee Notes ("The matter [of leading

9

questions] clearly falls within the area of control by the judge over the mode and order of interrogation and presentation and accordingly is phrased in words of suggestion rather than command."). Moreover, we perceive no prejudice or unfairness resulting from the leading questions asked. In the absence of such prejudice or unfairness, we cannot reverse on this basis. As the Ninth Circuit Court of Appeals recently observed: "Reversal on the basis of improper leading questions is only appropriate if the district court's ruling 'amounted to, or contributed to, the denial of a fair trial.'" United States v. Garcia-Gastelum, 650 F. App'x 470 (9th Cir. 2016) (quoting Miller v. Fairchild Indus. Inc., 885 F.2d 498, 514 (9th Cir. 1989) (as amended)).

The bankruptcy court found Dunkel's version of events more credible than McClain's or Key's. We give particular deference to the bankruptcy court's credibility findings given the bankruptcy court's ability to view firsthand the witnesses' demeanor and tone on the witness stand. Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010) (citing Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985)).

Furthermore, a factual finding is not clearly erroneous unless it is "illogical, implausible, or without support in the record." In re Retz, 606 F.3d at 1199. We perceive nothing illogical, implausible or unsupported in the bankruptcy court's assessment of Dunkel's credibility on the critical points in dispute, nor in the dispositive inferences the court drew from

10

his testimony.[2]

The other critical evidence supporting the bankruptcy court's misappropriation finding concerned body work that Crown performed for Henry Sahin – McClain's brother-in-law. In late 2004, after the body work on Sahin's Mercedes had been completed, Dunkel repeatedly asked McClain if Crown had received payment for that work, and McClain repeatedly assured Dunkel that the work would be paid for. In the course of making his payment inquiries, Dunkel discovered a copy of a check identifying Amex Assurance Company as the payor and made payable to Sahin and Crown in the amount of $8,032.56. But Dunkel never found a copy of any deposit slip setting forth this dollar amount, or any other indication that the Amex check ever was deposited in Crown's bank account.

After Dunkel confronted McClain regarding this discrepancy, McClain eventually presented Dunkel with a new check in the amount of $8,000, this one identifying Sahin's corporation as the payor and Crown as the sole payee.

Later on, Dunkel obtained from Amex Assurance Company a copy of the original Amex check. This copy showed endorsement

---

[2]In the parties' joint pretrial statement, the parties stipulated to the following fact: "Plaintiff used persons other than the defendant to take checks from customers of the plaintiff to a check cashing facility to obtain cash." But the record indicates a distinction between "customer checks" and "insurance company checks." The focus of the parties' dispute – and Dunkel's testimony – always was on insurance company checks and not on customer checks. Thus, the fact that customer checks sometimes were cashed does not significantly undermine the credibility of Dunkel's version of events regarding Crown's handling of insurance company checks.

11

information on the back of the check similar to the other 46 insurance checks that Crown accused McClain of embezzling. According to Crown, McClain gave all of these insurance checks to Diaz for cashing instead of processing them for deposit in Crown's bank account, as directed by Dunkel.

When McClain testified at trial, he admitted that the signature on the back of the Amex check was Diaz's, that the phone number on the back of the check also was hers, and that he gave it to Diaz to cash. McClain insisted, however, that Dunkel had directed him to have Diaz cash the Amex check, that he had given Dunkel the proceeds from the cashed Amex check, and that Dunkel later gave him back this cash and asked McClain to obtain a new check from Sahin.

This whole episode involving the two Sahin checks took place in late 2004 and early 2005, shortly before McClain quit working for Crown and went to work for a competitor. McClain said that he quit because Dunkel was attempting to impose a new cash acceptance policy that would require McClain to sign for all cash he received on behalf of Crown, but the bankruptcy court found that his quitting at that time was part of his attempt to conceal the 47 insurance checks he misappropriated.

More pertinently, the bankruptcy court found that McClain's testimony regarding the two Sahin checks was "especially lacking in credibility." According to the court, it did not make any sense for Dunkel to ask for the Amex check to be cashed and later to return this cash and ask for payment to be resubmitted by Sahin in the form of a new check made payable to Crown. As the bankruptcy court further found: "[t]he more likely

12

explanation is that Defendant cashed the check and later had his brother-in-law write a new check, after Mr. Dunkel noticed that Plaintiff did not receive the insurance company payment for work done to Mr. Sahin's car." Statement of Decision (April 13, 2016) at p. 19 of 22.

On this record, we cannot say that these findings (or the bankruptcy court's ultimate finding that McClain embezzled all 47 insurance company checks) were illogical, implausible or without support in the record.

McClain complains that there was no evidence that McClain received a single penny from the 47 cashed insurance checks. We agree that there was no direct evidence that McClain received any of the cashed check proceeds, but the bankruptcy court obviously inferred from the entirety of the trial record that McClain received some sort of benefit as a result of the insurance checks he misappropriated. The court specifically found that McClain was friends with Diaz, acted in concert with Diaz, and had financial troubles, which gave him motive to seek funds beyond what Crown paid him. None of these findings were clearly erroneous. In any event, personal benefit is not a required element for an embezzlement claim under § 523(a)(4). See In re Littleton, 942 F.2d at 555; In re Wada, 210 B.R. at 576. Put another way, while the personal benefit the defendant hoped to gain is relevant to the embezzlement claim, it is not a prerequisite.

There are several other facts the bankruptcy court relied upon in support of its inference that McClain misappropriated the 47 insurance checks. For instance, the bankruptcy court pointed

13

out that Diaz only rented space from Crown for roughly eight months, whereas the check cashing scheme spanned two years – between 2003 (shortly after Gross left) and 2005 (shortly before McClain quit). As the bankruptcy court reasoned, someone must have helped Diaz (who was not a Crown employee) access the checks – either McClain or Dunkel. And the bankruptcy court, despite some conflicting evidence, believed Dunkel's version of events: that McClain, without Crown's authorization or knowledge, gave the checks to Diaz to cash them for her own purposes. We cannot conclude that the bankruptcy court's ruling crediting Dunkel's testimony on this issue over McClain's and Key's testimony was illogical, implausible or without support in the record. "Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." Anderson, 470 U.S. at 574.

Finally, the bankruptcy court rejected McClain's supposition that Dunkel was motivated to cash insurance checks, instead of depositing them, as part of a scheme to evade income tax liability for revenue derived from the insurance checks. As the bankruptcy court pointed out, both Dunkel and McClain agreed in their testimony that insurance companies routinely issued IRS Form 1099's documenting for income tax purposes the insurance payments they made to Crown. Since the insurance payments already were documented for income tax purposes, the bankruptcy court reasoned, cashing insurance checks would not help Crown evade income tax liability.

In sum, McClain has not persuaded us that any of the bankruptcy court's essential findings in support of its

14

embezzlement determination were clearly erroneous.

## CONCLUSION

For the reasons set forth above, the bankruptcy court's § 523(a)(4) judgment is AFFIRMED.