NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP Nos.  WW-12-1072-DTaKu |
| | WW-12-1073-DTaKu |
| TERRY DEFOOR, | (Consolidated) |
| Debtor. | Bk. No.  10-17470-KAO |
| | Adv. No. 11-01060-KAO |
| TERRY DEFOOR, | |
| Appellant, | |
| v. | **M E M O R A N D U M**[1] |
| RAFEL LAW GROUP PLLC, | |
| Appellee. | |

Argued and Submitted on October 17, 2013
at Seattle, Washington

Filed - November 12, 2013

Appeal from the United States Bankruptcy Court
for the Western District of Washington

Honorable Karen A. Overstreet, Bankruptcy Judge, Presiding

Appearances:    Richard Birinyi, Esq. of Schwabe, Willimason &
Wyatt argued for Appellant; Bridget G. Morgan,
Esq. of Bush Strout & Kornfeld argued for
Appellee.

Before: DUNN, TAYLOR and KURTZ, Bankruptcy Judges.

---

[1] This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may
have (see Fed. R. App. P. 32.1), it has no precedential value.
See 9th Cir. BAP Rule 8013-1.

The debtor, Terry Defoor, appeals the bankruptcy court's order granting summary judgment to deny his chapter 7 discharge under § 727(a)(5).[2]  We AFFIRM.

**FACTS**

For over nineteen years, Terry and Stacey Defoor had a committed domestic partnership; after five years of marriage, they divorced in 1992 but reunited after a brief separation, living together until October 2006.  Over the course of their relationship, Terry and Stacey acquired numerous assets, including several homes, undeveloped plots of land, furniture and cars.  They also jointly operated a real estate acquisition and development company, GWC Development Incorporated, Inc. ("GWC, Inc.").

A month after they ended their relationship, Stacey initiated a state court action against Terry seeking a division of their assets ("state court action").  After over two years of litigation, the state court entered a judgment ("Judgment") awarding Stacey approximately $2.22 million against Terry and GWC, Inc., jointly and severally.  It also awarded her several undeveloped real properties and various homes and the furniture therein, among other assets.  The state court later amended the Judgment, reducing Stacey's money award from $2.2 million to

---

[2] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as "Civil Rules."

2

approximately $1.85 million ("Amended Judgment").[3]  The Amended Judgment remained effective nunc pro tunc, with interest to accrue beginning November 20, 2008, at 12% per annum.

Terry filed a chapter 11 bankruptcy petition on June 29, 2010.  He converted his chapter 11 bankruptcy case to chapter 7 on June 6, 2011.

Terry listed Stacey as a creditor with a disputed $2.2 million general unsecured claim.[4]  He scheduled no income and no

_____

[3] Terry filed an appeal, and Stacey filed a cross-appeal of the Judgment.  On August 16, 2010, in an unpublished decision, the state appellate court affirmed in part and reversed in part. The state court entered the Amended Judgment pursuant to the state appellate court's unpublished decision.

[4] Stacey filed a proof of claim (claim no. 7) on October 14, 2010, in an amount "to be determined."  However, in an exhibit attached to claim no. 7, she mentioned the Judgment providing her the $2.22 million money award.  (Apparently, she did not specify the claim amount because of Terry's appeal and her cross-appeal of the Judgment.)  She amended her proof of claim (claim no. 7-2) on October 26, 2011, again in an amount "to be determined."  In an exhibit attached to claim no. 7-2, she mentioned the Amended Judgment providing her the $1.85 million money award.
Stacey filed another proof of claim (claim no. 10) on June 20, 2010, in the amount of approximately $2.57 million, based on the Judgment.
Rafel Law Group represented Stacey in the state court action.  It later obtained a judgment and a supplemental judgment ("Rafel Law Group Judgments") against Stacey, presumably based on attorneys' fees incurred in the state court action.  The Rafel Law Group Judgments totaled approximately $2.03 million.  Rafel Law Group later acquired all of Stacey's rights to and interests in claim no. 7-2 and claim no. 10 by execution at a sheriff's sale.
After filing a notice of transfer of claim no. 7-2 and claim no. 10 (collectively, "claims"), Rafel Law Group was substituted for Stacey as the creditor regarding the claims against Terry's

(continued...)

expenses.

Terry scheduled a home located in Kirkland, Washington ("Kirkland Home"), valuing it at $1.8 million. He scheduled $21,155 in cash on hand and in a bank account, $220,833 in accounts receivable, $393,800 in anticipated tax refunds, several vehicles, including cars, a snowmobile and a boat, furniture, electronics, tools and office equipment. He also scheduled approximately $1.88 million in loans made to GWC, Inc. and GWC & Associates, Inc., a related entity (collectively, "GWC loans"),[5] and ownership interests in various entities, including GWC, Inc. and GWC & Associates, Inc. (collectively, "GWC ownership interests"). He initially did not claim any of these assets exempt.

Terry amended his schedules several times to include other assets, such as various parcels of undeveloped land, machinery and jewelry. He also reduced the value of several assets to $0,

---

[4](...continued)
chapter 7 bankruptcy estate. On July 17, 2012, the bankruptcy court entered an order substituting Rafel Law Group for Stacey as the plaintiff in the subject adversary proceeding.

[5] Terry was the 100% owner of both GWC, Inc. and GWC & Associates, Inc.
On March 11, 2010, GWC, Inc. and GWC & Associates, Inc. each filed chapter 11 bankruptcy petitions (case nos. 10-12697 and 10-12699, respectively). On April 26, 2010, the bankruptcy court substantively consolidated the two chapter 11 bankruptcy cases under lead case no. 10-12697 ("GWC, Inc. chapter 11 bankruptcy case").
On Terry's motion, the bankruptcy court entered an order on December 2, 2010, substantively consolidating his chapter 11 bankruptcy case with the GWC, Inc. chapter 11 bankruptcy case under the lead case no. 10-17470.

4

including one account receivable, the GWC loans and GWC ownership interests. Terry claimed exemptions in most, if not all, of the assets.

On January 14, 2011, Stacey initiated an adversary proceeding against Terry seeking to deny his discharge under § 727(a)(5), applicable in Chapter 11 pursuant to § 1141(d)(3)(C) ("complaint").[6] In her complaint, she alleged that Terry had acquired personal property and real property assets totaling approximately $9 million in value between 2006 and 2008. She asserted that Terry had "sole control" over at least $8 million in cash.

According to Stacey, between September 2006 and October 2007, Terry, GWC, Inc. and/or GWC & Associates, Inc. obtained these funds by selling the following assets: a boat, a condo located in Costa Rica ("Costa Rica Condo") and certain real property located in Renton, Washington ("Renton Slope Property"). They also received funds as part of an assignment fee from an entity named CamWest Development, Inc. ("CamWest") and as part of a transaction with CamWest concerning certain real property

---

[6] Stacey moved to amend her complaint to add a § 727(a)(3) claim. Terry initially opposed, but later agreed to allow Stacey to amend her complaint. The bankruptcy court entered an agreed order on September 12, 2011, a few days after the summary judgment hearing. She filed the amended complaint on the same day.

Stacey later moved to dismiss the § 727(a)(3) claim ("motion to dismiss") in the amended complaint, as the bankruptcy court already had entered an order granting summary judgment on the § 727(a)(5) claim. On November 7, 2011, three days after a hearing on the motion to dismiss, the bankruptcy court entered an order dismissing the § 727(a)(3) claim with prejudice.

5

located in Federal Way, Washington. The remainder of the funds came from an investment account in GWC, Inc.'s name.

Stacey further alleged that, under the Judgment, Terry received approximately $682,000 total in vehicles, furnishings, watches, audio equipment and a country club membership, among other personal property assets. She pointed out that although Terry had valuable personal property assets, he undervalued certain personal property items or omitted them on both his original and amended schedules. Terry also failed to explain the disposition and/or loss of certain personal property and real property assets in both his original and amended schedules and statement of financial affairs (collectively, "bankruptcy documents"). He further failed to account for the sale or transfer of these personal property and real property assets in the bankruptcy documents.

A few months before the scheduled trial in October 2011, Stacey moved for summary judgment ("Summary Judgment Motion") on her complaint. She contended that Terry's chapter 7 discharge should be denied because he failed to explain satisfactorily the loss and/or disposition of the funds to meet his liabilities under § 727(a)(5).

She claimed that Terry had control over approximately $11.5 million in cash ("funds") since October 2006, but failed to explain adequately the disposition and/or loss of the funds. Stacey relied on a document titled "Schedule of Combined Cash Receipts and Disbursements" ("Summary") that Terry filed in the

6

main bankruptcy case.[7]  The Summary listed the funds Terry and/or GWC Inc. held from October 1, 2006 to December 31, 2009.[8]

According to the Summary, most of the funds came from sales of assets (e.g., the Costa Rica Condo, boats and several vehicles) and from an increase in credit card balances.  Stacey pointed out that the Summary failed to reference additional cash receipts, however.  Specifically, though Terry had testified at the § 341(a) meeting that another related entity, GWCM, LLC, obtained $1.14 million in loans, the Summary failed to reference the loans.

Stacey noted that Terry and/or GWC, Inc., GWC & Associates, Inc. and GWCM, LLC (collectively, "GWC Entities") used some of the funds to purchase the Kirkland Home, an apartment complex located in Sea-Tac, Washington ("Sea-Tac Apartments") and undeveloped real property located in Branson, Missouri ("Boren Property").  Terry and/or the GWC Entities also used the funds to furnish the Kirkland Home and model homes located in Branson, Missouri ("Branson Model Homes").  They also used the funds to make improvements to the Kirkland Home and undeveloped real property intended for a recreational residential community

[7] We note that the Summary lists "GWC Corp."  We assume that Terry meant to refer to GWC, Inc.

[8] Terry attached the Summary as Exhibit 4 to his declaration in support of his response to Stacey's motion for an order establishing her interest in certain sale proceeds and an order to appoint a chapter 11 trustee ("Right to Sale Proceeds Motion").

7

located in Branson, Missouri ("Lea Ridge Property"),[9] as well as to purchase equipment.

Terry and/or the GWC Entities moreover spent approximately $4.8 million between October 2006 and December 2009 for "business expenses." She pointed out that the Summary indicated only $10,294,202 in total disbursements, which was $1,195,000 less than the funds Terry admitted to holding between October 1, 2006 and December 31, 2009.

Stacey contended that although his bankruptcy documents indicated that he and the GWC Entities had little or no cash available as of the petition date, he failed to provide helpful and reliable evidence to explain adequately the disposition and/or loss of the subject funds.

For example, during discovery, Terry gave Stacey nineteen boxes of documents that he used in preparing the Summary. Upon review, Stacey found that she could not rely on the documents to "verify the accuracy of the figures contained in the Summary." Instead of producing copies of cancelled checks, credit card billing statements, tax returns and other source documents used for the Summary, Terry simply referenced the Summary, a spreadsheet, "accountings" and other self-prepared financial

---

[9] Terry and Stacey both refer to two parcels of real property as the "Boren Property" and the "Lea Plat/Forsythe Plat" or "Lea Ridge/Forsythe Plat" ("Lea Ridge Property"). Based on our review of the record, it seems that both parcels of property were located in Branson, Missouri. The Boren Property apparently was real property separate from the Lea Ridge Property.

8

statements.[10]  He moreover insisted that he already had produced the relevant source documents.

Terry opposed the Summary Judgment Motion ("Summary Judgment Opposition"), claiming that he had provided adequate records accurately detailing his every financial transaction.  He asserted that he had produced all of his bank account statements, cancelled checks, QuickBook records and credit card statements.

Terry insisted that his documentary evidence contained "detailed explanations of each and every payment during the relevant period, including where the payments [were] accounted." He maintained that there was a "total lack of any evidence that there [were] missing funds."  He moreover argued that neither the Bankruptcy Code nor case law required him to "individually identify, catalogue, and produce line by line, the checking account records, canceled checks, underlying invoices, and supporting data for each of these almost 3,000 transactions on pain of losing his discharge."

Terry averred that the declaration of Ed Rich ("Rich"), his long-time accountant ("Rich Declaration"), and the deposition of Paul Sutphen ("Sutphen"), Stacey's forensic accountant ("Sutphen Deposition"),[11] showed that he had explained his financial

---

[10] According to his response to request for admission no. 3 in Stacey's first set of interrogatories, Terry "created a spreadsheet detailing every deposit and withdrawal from all bank accounts held by [himself], GWC and [GWC & Associates, Inc.] since September 2006 . . . ."

[11] Sutphen had been deposed in the state court action. Terry submitted portions of the Sutphen Deposition as an exhibit
(continued...)

transactions adequately. Neither Sutphen nor Rich uncovered any "unaccounted for transactions." He claimed that Sutphen also found no evidence of fraud. He further contended that Rich testified that there was adequate "back up information" for his financial transactions.

Terry offered the Rich Declaration in support of his Summary Judgment Opposition. Rich acknowledged that Terry used QuickBooks for his personal and business accounting. He maintained that QuickBooks was "adequate for [Terry's] business" and that it "provide[d] considerably more detail than other programs on the market . . . ."

Rich explained that he was familiar with the QuickBooks accounts for Terry and the GWC Entities because he "was primarily engaged in completing the tax returns for the [GWC Entities] and for [Terry] personally." He went on to explain that he had helped Terry prepare the spreadsheet, which reconciled "all of the bank accounts (except the GWCM, LLC account)." They created the spreadsheet by reconciling every monthly bank account statement with the corresponding entry in the QuickBooks account. The spreadsheet also listed the date of each payment and identified the payee.

Rich then explained that he created the Summary to help others "understand what each payment was for and why it was made," as the spreadsheet did not summarize the expenses paid with a specific check by category. He acknowledged that "some of

---

[11](...continued)
to his own declaration.

10

the headings [in the summary] were not 100% technically correct because of the labels and because some of the transactions did not actually involve fully cash transactions." Rich also prepared additional spreadsheets identifying "the composition of each line item by date, the account from which the transfer was made, the identity of the payee, and the account that the transaction was posted to on QuickBooks."

Rich maintained that although he personally never audited, reviewed or compiled Terry's books, "there [were] no significant or material unrecorded transactions that involve funds in bank accounts." He further asserted that the Summary and spreadsheets he and Terry had prepared completely and accurately accounted for all of the transactions that Terry and the GWC Entities had entered into since Terry and Stacey's separation. He also averred that he had not discovered any proof of any activity indicating that Terry had concealed funds.

In his own declaration, Terry explained the processes he and Rich used in creating the spreadsheet (which listed the name of every payee for all transfers to and from his bank accounts), the Summary (which identified general expense categories and various expenses) and the accountings (which identified payees and payers and all of the transfers to and from his bank accounts).

Terry also referenced the Sutphen Deposition in support of his Summary Judgment Opposition. He mainly relied on Sutphen's testimony to show that his financial records contained no "disconcerting" information. According to Terry, throughout the state court action, Stacey alleged that he had transferred funds out of the country. Stacey employed Sutphen to identify any

11

unusual tracing of funds through Terry's bank accounts.  She also tasked Sutphen with the preparation of a balance sheet of assets and liabilities as of the date of Stacey and Terry's separation.

Sutphen testified that although he found some "very odd transactions through [Terry's] bank and investment accounts . . . they all appeared to be accounted for properly at the end."  He also testified that he found no evidence of any fraud by Terry concerning his assets and liabilities, as well as those of GWC, Inc.

In her reply to Terry's Summary Judgment Opposition, Stacey claimed that Terry failed to account for at least $921,504 of the approximately $11 million in cash he held after their separation in October 2006.  She highlighted specific inaccuracies in the accounting documents Terry provided.

Stacey first referenced a document titled, "Investment in Renton Land Detail" ("Renton Slope Property Accounting").  The Renton Slope Property Accounting listed funds used for the Renton Slope Property between October 1, 2006 and December 31, 2009. She pointed out that Terry had spent a total of $464,955 for the Renton Slope Property before October 1, 2006, even though the Renton Slope Property Accounting purportedly covered the period between October 1, 2006 and December 31, 2009.

She next contended that Terry included double payments of $100,000 to WGC, Inc.  He listed a $100,000 payment to WGC, Inc. in a document titled, "Investment in Kirkland Home Detail" ("Kirkland Home Accounting").  He then listed a $100,000 payment to WGC, Inc. as a debit in a document titled, "Shareholder Distributions Detail" ("Shareholder Accounting").  Stacey argued

12

that Terry's "artificial reduction of cash [thus] result[ed] in an additional $100,000 being unaccounted for by [Terry]."

Stacey claimed that Terry also mischaracterized several transactions. In a document titled, "Stacy [sic] Defoor Payments Expense Detail" ("Stacey Expense Accounting"), Terry stated that he made $92,549 in payments on her behalf. Terry included in the Stacey Expense Accounting the entire $92,549 "book value" of two cars, a 2003 Porsche Boxster and a 2004 Porsche Cayenne, that were awarded to Stacy in the state court action. He reported that these transactions reflected a $92,549 use of cash. But, Stacey noted, neither a check number nor a reference to a wire transfer was made. She argued that the transfer of two cars owned free and clear did not constitute "a use of cash." Terry thus overstated his use of cash by $92,549.

In another document titled, "Model Home Furniture and Equipment lost in Repossession Expense Detail" ("Model Home Expense Accounting"), Terry represented that his cash was depleted by $65,000. The $65,000 reduction in cash allegedly had resulted from the repossession of "model home furniture and equipment." Stacey contended that Terry could not characterize "repossession" as a use of cash when he already had paid for the furniture and equipment.

Terry further overstated his expenses by claiming that he had used $50,000 to purchase vacant land located in Redmond, Washington ("Redmond Fowler Property"). Stacey pointed out that Terry did not spend any funds to acquire the Redmond Fowler Property. Rather, he obtained an interest in the Redmond Fowler Property as partial compensation under an agreement with CamWest

13

in 2005.

In a document titled, "Lea Ridge Building, Furniture and Equipment Destroyed During Snowstorm (Uninsured) Expense Detail" ("Lea Ridge Accounting"), Terry counted $30,000 as a use of cash that resulted from the destruction of furniture and equipment in a snowstorm at the Lea Ridge Property. Stacey argued that Terry again overstated his expenses by characterizing the destruction of furniture and equipment as a use of cash, even though he previously had purchased the subject furniture and equipment.

Terry also listed a total of $44,000 as expenses in a document titled, "Security and Escrow deposits Forfeited Expense Detail" ("Security and Escrow Deposit Accounting"). He listed $20,000 paid as "additional security deposits per Terry D," and $24,000 paid as "additional escrow deposits per Terry D." Stacey contended that Terry did not provide a check number, payee or wire transfer for either of these transactions. She alleged that Terry again overstated his expenses by $44,000.

Stacey moreover argued that Terry failed to account for a total of $474,477.70 in improvements and/or purchases of equipment and furniture for the Kirkland Home, another model home and the Branson Model Homes (collectively, "Kirkland Home and Model Homes Furniture and Equipment Accounting"). He provided three documents, one titled, "Kirkland Residence Improvements, Equipment and Furnishings Detail" ("Kirkland Home Accounting"), another titled, "Model Home Furniture Detail ("Model Home Accounting"), and another titled, "Branson and Model Home Costs Abandoned Expense Detail" ("Branson Property Accounting"). She contended that Terry could not properly report that he converted

14

cash into personal property items. Instead, he must provide an inventory.

Stacey also contended that Terry's reliance on the Sutphen Deposition was misleading because Sutphen was not testifying about Terry's current accounting, which did not exist until three years after Sutphen was deposed. She pointed out that Sutphen was employed in August 2007 and deposed in December 2007. Stacey argued that nothing in his deposition could relate to Terry's use of cash after December 2007.

At the September 9, 2011 hearing on the Summary Judgment Motion, the bankruptcy court noted that Terry heavily relied on Sutphen's analysis of his books and records as evidence that they did not contain "anything of concern." Tr. of September 9, 2011 hr'g, 6:8. The bankruptcy court discounted Sutphen's analysis, however, as he had been "analyzing transactions prior to October 2006, and his deposition was taken December 14, 2007." Tr. of September 9, 2011 hr'g, 6:12-14. It found that Sutphen had "absolutely nothing relevant to say about the time period between . . . October 31, 2006 and December 31, 2009." Tr. of September 9, 2011, hr'g, 6:14-17.

Although the bankruptcy court agreed with Terry that he was not required to produce all of the source documents for his accounting, it believed that he had to respond to "some very specific things that were raised in the [Summary Judgment Motion] . . . in a way that [the bankruptcy court could] understand it." Tr. of September 9, 2011 hr'g, 6:2-4. The bankruptcy court proceeded to go through his accountings, questioning numerous transactions.

15

It first focused on the "$465,955 investment"[12] in the Renton Slope Property. The bankruptcy court noted that the funds used for the Renton Slope Property had been spent before October 1, 2006. It thus determined that the investment in the Renton Slope Property could not be included in the cash statement.

The bankruptcy court next looked at a $100,000 double deduction[13] for payments to WGC, Inc.[14] It agreed with Stacey that Terry had counted a $100,000 payment to WGC, Inc. twice.

The bankruptcy court then reviewed the payments totaling $92,549 that Terry allegedly made on Stacey's behalf. It agreed with Stacey that these payments did not constitute cash

---

[12] The amount reflected in the transcript is incorrect. According to the document titled, "Cash Flow - Investment in Renton Land Detail," the correct amount is $464,955.

[13] Again, the amount reflected in the transcript is incorrect. The amount is not $135,000 as stated in the transcript. Based on our reading of the relevant documents attached to the Rich Declaration and Stacey's reply in support of the Summary Judgment Motion, it seems that Stacey contested a $100,000 payment to WGC, Inc. She noted that Terry included a $100,000 payment to WGC, Inc. in the spreadsheet titled, "Investment in Kirkland Home Detail." Stacey argued that this $100,000 payment to WGC, Inc. increased Terry's alleged use of cash between October 1, 2006 and December 31, 2009. She pointed out that Terry included this same $100,000 payment to WGC, Inc. as a "debit" in his spreadsheet titled, "Shareholder Distributions Detail." Stacey contended that such accounting artificially reduced Terry's cash, resulting in another $100,000 being unaccounted for by him.

[14] The transcript lists "WCG," but Exhibit 5, "Cash Flow Investment in Property," attached to the Rich Declaration lists it as "WGC, Inc."

16

transactions; they were book values for two cars already awarded to Stacey in the state court action.

It then examined the $65,000 use of cash for the repossessed furniture for the model home. The bankruptcy court again agreed with Stacey that the repossession of the model home's furniture did not constitute a cash expense, though it was properly documented as an accounting transaction.

With respect to the $50,000 allegedly used for the purchase of the Redmond Fowler Property, the bankruptcy court noted it earlier addressed this matter in the main bankruptcy case.[15] It remained convinced that there was no use of cash toward the purchase of the Redmond Fowler Property.

The bankruptcy court reviewed the $30,000 deduction for the destruction of furniture and equipment in a snowstorm at the Lea Ridge Property. It concluded that this deduction was not a cash transaction – the Lea Ridge Property Accounting did not explain where the $30,000 had gone. It mentioned that the total $44,000 expense in security and escrow deposits also had not been explained.

The bankruptcy court then looked at the $474,477.70 spent in improvements and purchases of equipment and furniture for the Kirkland Home, another model home and the Branson Model Homes as listed in the Kirkland Home and Model Homes Furniture and Equipment Accounting. The bankruptcy court stated that it was

---

[15] The bankruptcy court addressed this issue when Stacey filed a motion for an order establishing her interest in the proceeds of the sale of the Redmond Fowler Property to CamWest. See main case docket no. 121.

17

unacceptable for Terry simply to say that he did not keep a detailed inventory of the furniture and equipment, given the significant prices he paid for them and the need for insurance coverage for them.

The bankruptcy court recognized that the accountings Terry provided were "summary in nature" and may have been "re-creations of what happened after the fact." Tr. of September 9, 2011 hr'g, 11:4, 11:9-10. It also pointed out that "[t]here [weren't] any source documents for anything." Tr. of September 9, 2011 hr'g, 11:4-5. The bankruptcy court further noted that Terry offered no testimony of any person who had input information into the QuickBooks accounts at the time of input.

The bankruptcy court determined that Terry did not meet his burden "to explain to [it] what happened with credible testimony." Tr. of September 9, 2011 hr'g, 12:21-22. Although Terry did not have to provide "hundreds of pages of accounting transactions," he had to explain "here's what [he] bought, and here's what happened to it." Tr. of September 9, 2011 hr'g, 13:3-4. The bankruptcy court further determined that it was unacceptable for and inaccurate of Terry to characterize accrual based transactions as cash transactions.

On November 7, 2011, the bankruptcy court entered an order ("Summary Judgment Order") granting Stacey's Summary Judgment Motion.[16] Terry timely appealed.

_____

[16] Terry moved to set aside the Summary Judgment Order under Civil Rule 59(e), applicable through Rule 9023 ("Motion to Reconsider"). The bankruptcy court denied the Motion to
(continued...)

18

**JURISDICTION**

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(I) and (J). We have jurisdiction under 28 U.S.C. § 158.

**ISSUE**

Did the bankruptcy court err in granting summary judgment to deny Terry's chapter 7 discharge under § 727(a)(5)?

**STANDARDS OF REVIEW**

We review de novo the bankruptcy court's legal conclusions, Decker v. Tramiel (In re JTS Corp.), 617 F.3d 1102, 1109 (9th Cir. 2010), and its interpretation of the Bankruptcy Code. Boyajian v. New Falls Corp. (In re Boyajian), 564 F.3d 1088, 1090 (9th Cir. 2009).

We apply this same standard of review to the bankruptcy court's grant of summary judgment. Id. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Ilko v. Cal. State Board of Equalization (In re Ilko), 651 F.3d 1049, 1052 (9th Cir. 2011)(quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)(internal quotation

---

[16](...continued) Reconsider, entering an order on January 23, 2012 ("Reconsideration Order"). Terry did not appeal the Reconsideration Order.

marks omitted)).  "In making this determination, conflicts are resolved by viewing all facts and reasonable inferences in the light most favorable to the non-moving party."  Id. (citation omitted).

We may affirm on any ground supported by the record.  Shanks v. Dressel, 540 F.3d 1082, 1086 (9th Cir. 2008).

**DISCUSSION**[17]

The only issue before us is whether Terry raised any genuine issue of material fact that would preclude summary judgment in Stacey's favor on her § 727(a)(5) claim for relief.  Based on our review of the record, we conclude that Terry did not.

Under § 727(a)(5), the bankruptcy court shall deny the debtor a discharge if he fails "to explain satisfactorily . . . any loss of assets or deficiency of assets to meet [his] liabilities."  The objecting creditor bears the initial burden of proof to demonstrate that: 1) the debtor at one time, not too remote from the petition date, owned identifiable assets; 2) the debtor no longer owned the assets as of the petition date; and 3) the bankruptcy documents do not reflect an adequate

---

[17] Terry urges us to review two additional declarations that he submitted to the bankruptcy court in support of his Motion to Reconsider.  We decline to review those declarations because we have been asked to consider on appeal only whether the bankruptcy court erred in granting Stacey's Summary Judgment Motion.  See Appellant's Opening Brief at 2 ("The sole issue in this case is whether it is proper to grant summary judgment in favor of the plaintiff.").  We therefore limit our review to the documents relating to the Summary Judgment Motion, as presented to the bankruptcy court.

20

explanation for the disposition of the assets.  Retz v. Samson (In re Retz), 606 F.3d 1189, 1205 (9th Cir. 2010).  "Once the objecting creditor has made a prima facie case, the debtor must offer credible evidence regarding the disposition of the missing assets."  Id. (citing Devers v. Bank of Sheridan, Montana (In re Devers), 759 F.2d 751, 754 (9th Cir. BAP 1985)).  The debtor's failure to provide an adequate explanation for the loss of assets constitutes sufficient ground for denial of his discharge under § 727(a)(5).  Retz, 606 F.2d at 1205 (citing Devers, 759 F.2d at 754).

"Vague and indefinite explanations of losses that are based on estimates uncorroborated by documentation are unsatisfactory." Bell v. Stuerke (In re Stuerke), 61 B.R. 623, 626 (9th Cir. BAP 1986)(citing In re Chalik, 748 F.2d 616, 619 (11th Cir. 1984)). A debtor "cannot omit items from his schedules, force the trustee and the creditors, at their peril, to guess that he has done so – and hold them to a mythical requirement that they search through a paperwork jungle in the hope of finding an overlooked needle in a documentary haystack."  Retz, 606 F.3d at 1206 (quoting Boroff v. Tully (In re Tully), 818 F.2d 106, 111 (1st Cir. 1987) (internal quotation marks omitted)).

On appeal, Terry maintains that he offered "full, accurate and complete accounting records" that adequately explained the loss and disposition of his assets.  He persists in asserting that he has accounted for every financial transaction entered into between October 2006 and December 2009.  He insists that "[t]here is simply no missing money."  Terry complains that, in making its determination under § 727(a)(5), the bankruptcy court

21

ignored the Rich Declaration, the Sutphen Deposition and the accountings and Summary he provided.

Contrary to his contentions, the bankruptcy court carefully reviewed all of the accountings, Summary and other financial documents he provided as evidence in support of his Summary Judgment Opposition. It highlighted a number of significant expenses Terry claimed he made, which, in actuality, were not cash transactions.

Terry disregards the bankruptcy court's concern that he failed to provide source documents for certain questionable transactions. He also ignores its concern that he mischaracterized numerous transactions; instead of identifying these transactions as accrual based or accounting transactions, Terry labeled them as cash transactions.

Reviewing Terry's documentary evidence (e.g., the Summary and the accountings), the bankruptcy court reasoned that it was not credible to explain the losses and deficiencies in his assets. (It noted that the Summary and accountings may have been re-creations of financial transactions after the fact.) It found a number of substantial discrepancies and inaccuracies in the Summary and accountings that Terry failed to explain away or to provide source documents to support. Under these circumstances, the bankruptcy court determined that the documentary evidence submitted by Terry was inadequate to raise a genuine issue of material fact in opposition to the Summary Judgment Motion.

Once Stacey demonstrated that Terry did not provide sufficient explanations as to losses of his assets, it was up to Terry to provide countering evidence to establish the existence

22

of a genuine issue of material fact.  Because Terry failed to do so, the bankruptcy court did not err in granting summary judgment on Stacey's § 727(a)(5) claim and denying Terry's discharge.

## CONCLUSION

Terry did not raise any genuine issue of material fact as to the inadequacy of his explanation for the loss and/or dissipation of certain of his assets.  The bankruptcy court did not err in granting summary judgment on Stacey's § 727(a)(5) claim.  We AFFIRM.

23