FILED

JUN 03 2016

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: ) | BAP No. AZ-15-1130-KuJaJu |
| ) | |
| MEDPOINT MANAGEMENT, LLC, ) | Bk. No. 14-15234 |
| ) | |
| Debtor. ) | |
| _____ ) | |
| MEDPOINT MANAGEMENT, LLC, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | **MEMORANDUM**[*] |
| ) | |
| JASON JENSEN; MIKE DANZER; ) | |
| 7511 IRA INVESTMENTS, LLC; ) | |
| ROBERT BROWN, ) | |
| ) | |
| Appellees. ) | |
| _____ ) | |

Argued and Submitted on May 20, 2016
at Phoenix, Arizona

Filed – June 3, 2016

Appeal from the United States Bankruptcy Court
for the District of Arizona

Honorable Daniel P. Collins, Chief Bankruptcy Judge, Presiding

Appearances:     Jonathan Frutkin of The Frutkin Law Firm Plc
argued for appellant Medpoint Management, LLC;
Anthony Warren Austin of Fennemore Craig, P.C.
argued for appellees Jason Jensen, Mike Danzer,
7511 IRA Investments, LLC and Robert Brown.

_____

[*]This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may
have (see Fed. R. App. P. 32.1), it has no precedential value.
See 9th Cir. BAP Rule 8024-1.

Before: KURTZ, JAIME[**] and JURY, Bankruptcy Judges.

## INTRODUCTION

Four creditors of alleged debtor Medpoint Management, LLC filed an involuntary chapter 7[1] petition against Medpoint. The bankruptcy court granted Medpoint's motion to dismiss because of Medpoint's connection to the cultivation and sale of medical marijuana, which might be legal under Arizona law but still is illegal under federal law. The petitioning creditors have not appealed the bankruptcy court's dismissal.

In the process of dismissing the petition, the bankruptcy court ruled that Medpoint was not entitled to recover from the petitioning creditors its attorney's fees, costs and punitive damages, and the court denied as unnecessary Medpoint's request for an evidentiary hearing on those issues. Medpoint appeals those rulings.

The bankruptcy court never permitted the parties to fully develop the record regarding the controlling factual issues, including whether Medpoint generally was paying its (undisputed) debts as they came due, whether the petitioning creditors' motives and intentions were culpable and whether the petitioning creditors acted in bad faith. Accordingly, we will VACATE the portion of the dismissal order denying Medpoint's requests for

---

[**]Hon. Christopher D. Jaime, United States Bankruptcy Judge for the Eastern District of California, sitting by designation.

[1]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. All "Civil Rule" references are to the Federal Rules of Civil Procedure.

fees, costs and punitive damages, and we will REMAND for further proceedings.

**FACTS**

To provide context, we begin our factual recitation with a description of Medpoint's business, its relationship with other key players, and the transactions leading up to the filing of the involuntary petition.[2]

Medpoint is an Arizona limited liability company formed to provide a full range of management services to companies holding certificates issued by the state of Arizona permitting them under Arizona law to grow and sell medical marijuana. Because Arizona law requires all certificate holders to operate on a not-for-profit basis, management service companies like Medpoint also help the certificate holders maintain their nonprofit status by managing their cash flow to ensure that revenues are distributed to pay the certificate holders' operating expenses, taxes and management fees.

Medpoint only provided management services to one certificate holder, Arizona Nature's Wellness ("ANW"). Medpoint obtained that position in January 2013 by acquiring the management service company then under contract with ANW – Tier Management, LLC. At the time of the acquisition, Mike Danzer owned and controlled Tier. He sold his interest in Tier to Medpoint in exchange for $450,000, with $150,000 paid up front and the remainder to be paid in installments of $150,000 each.

---

[2]Most of these background facts are not in dispute, so we in large part have relied upon the description of these facts contained in the bankruptcy court's final ruling.

3

Danzer is one of the petitioning creditors.

Robert Brown and 7511 IRA Investments, LLC also are petitioning creditors and also loaned money to Medpoint. Robert Brown loaned Medpoint $100,000, and 7511 IRA Investments, LLC loaned Medpoint $400,000. In addition, Medpoint entered into consulting contracts with Danzer and another man named Jason Jensen pursuant to which Medpoint promised to pay Danzer and Jensen $5,000 per month each. Jensen is the fourth and final petitioning creditor.

The person who currently owns and controls Medpoint, Yuri Downing, admitted at his deposition that none of the petitioning creditors have been repaid. He indicated that at least some of the above-referenced debt is disputed, although the reasons he offered for disputing the debt were thin. For instance, when asked about Danzer's and Jensen's monthly consulting fees, Downing indicated that the fees were not due because Medpoint ultimately did not need or use Danzer's or Jensen's consulting services. But Downing also admitted that there was nothing in the consulting contracts making Medpoint's obligation to pay the consulting fees contingent on the actual provision of consulting services.

Meanwhile, when asked whether Medpoint had the ability to repay the $400,000 owed to 7511 IRA Investments, LLC, Downing responded as follows:

A.   Are we in a position to make that payment today?
No.   Are we in a position to make that payment in the
next 30 days? I cannot say.

Q.   Are there prospects that you could be in a position
in 30 days to make a $400,000 loan payment?

4

A. I'm still a dreamer and I still believe I can make things happen magically, so yes, I think I – I – the answer is I don't know, but I'd sure like to try.

Depo. Tans. (Jan. 8, 2015) at 136:14-21.

Downing further admitted that, at the time of the petition filing, Medpoint's only regular source of income was an $8,000 per month licensing fee it is being paid for the use of the Bloom name and trademark, which is still being used in ANW's business.

At the time of Medpoint's acquisition of Tier, in January 2013, Yuri Downing and Matt Morgan each owned and controlled one of the two LLC members of Medpoint – Ask Nice Twice, LLC and Here Is Now, LLC, respectively. Similarly, Morgan and Downing owned and controlled another management services company, Bloom Master Fund I, LLC, which was under contract with the certificate holder for a Tucson marijuana dispensary.

In February 2014, Morgan divested himself of ownership and control of both Medpoint and Bloom Master Fund I, LLC. At that time, Morgan resigned from management and effectively conveyed his interests in both companies to Downing. According to Downing, with Morgan gone, he was looking for someone to help him with management and operations at Medpoint and Bloom Master Fund I, LLC, and he turned to Ed Vartughian for help. Downing indicated that Morgan had introduced him to Vartughian, that he did not know Vartughian well, and that he did not know who else to turn to for help. Ultimately, Vartughian bought Downing's interest in Bloom Master Fund I, LLC and agreed to help Downing "fix" Medpoint's problems, but declined to purchase Medpoint.

Downing in essence claimed that Vartughian convinced ANW's board of directors to declare Medpoint in breach of its

5

management services contract with ANW and to terminate the contract on that basis. This seems odd because ANW's board allegedly is a captive entity appointed by Medpoint, so Medpoint supposedly had the ability to control the ANW board and its decisions. ANW and Medpoint then entered into a settlement agreement pursuant to which each side apparently agreed to release the other from any claims arising from the management services contract. Downing was unable to identify what amount of management fees Medpoint might have forfeited as a result of the settlement agreement. Downing expressed more concern about Medpoint's potential liability for mismanaging ANW's business.

Whereas Downing characterized ANW's termination of and settlement with Medpoint as fixing Medpoint's problems, the petitioning creditors saw these dual transactions differently. The petitioning creditors asserted that the two transactions amounted to a fraudulent transfer of Medpoint's crown jewel asset: its management services contract with ANW. Bloom Master Fund I, LLC, now apparently owned by Vartughian, ended up with a potentially valuable management relationship with ANW. Meanwhile, Medpoint ended up as a virtually empty shell with a significant amount of debt owed to the petitioning creditors and others. After the settlement with ANW, Medpoint's only assets consisted of: (1) the property rights associated with the Bloom name and trademark; (2) the agreement with Bloom Master Fund I, LLC licensing the Bloom name and trademark for $8,000 per month; and (3) any claims arising from the termination by and settlement agreement with ANW.

Shortly after the petitioning creditors filed the

6

involuntary petition, Medpoint filed an answer. In its answer, Medpoint denied the allegation that it was not paying its debts as they became due. Medpoint further alleged that many of the claims it had not paid were the subject of bona fide dispute.

At the initial status conference held in November 2014, the bankruptcy court set dates for a discovery deadline, for a continued status conference and for trial on the merits of the involuntary petition. By the time of the continued status conference held on January 29, 2015, Medpoint had filed a motion to dismiss the involuntary petition, and the petitioning creditors had filed a response. Medpoint's dismissal motion asserted that the bankruptcy court should dismiss the involuntary petition because Medpoint's business involved illegal drugs. Medpoint posited that the bankruptcy court could not and should not supervise the administration of a debtor whose business was so closely connected to the cultivation and sale of marijuana because those activities were illegal under federal law. Alternately, Medpoint argued that the petitioning creditors came to the bankruptcy court with unclean hands because they all were aware of the illegal nature of ANW's business and Medpoint's connection to that business. Finally, Medpoint claimed that it was entitled to damages under § 303(i) because the petitioning creditor's actions were motivated by a bad faith desire to take control of ANW's valuable medical marijuana certificate.

In response, petitioning creditors attempted to demonstrate that Medpoint's business at the time the involuntary petition was filed was not so connected to the medical marijuana industry as to justify dismissal. They further pointed out that there was no

7

proof that any of the revenue that Medpoint generated came directly from the growing or sale of marijuana.

At the January 29, 2015 status conference, the bankruptcy court ruled that it would take off calendar the trial date. The court decided it would reserve the merits of the involuntary petition and the issue of bad faith and damages against the petitioning creditors until after it ruled on the motion to dismiss. Thereafter, whenever the parties touched upon the merits of the involuntary petition or upon the bad faith/damages issue, the bankruptcy court steered them back to the issues addressed in the motion to dismiss. For instance, after the petitioning creditors raised a disputed point pertaining to the bad faith issue, the bankruptcy court responded as follows:

> THE COURT: I think I can cut you off on this subject because in my view that's a fact issue, and if I'm going down that road we're trying the issue, not resolving it today.
>
> * * *
>
> THE COURT: Bad faith is not generally something you're resolving on a motion in any event.

Hr'g Tr. (Jan. 29, 2015) at 54:5-25.

Furthermore, the court assured the parties that they would be given a future opportunity to present evidence on the merits and on the damages issue – if necessary. The following exemplifies the court's assurances:

> THE COURT: It seems to me that unless there are stipulated facts that demonstrate bad faith, bad faith is generally a factual issue. And if I ultimately conclude that I need a full blown hearing on bad faith, I think it really has to be an evidentiary hearing.

Hr'g Tr. (March 4, 2015) at 68:5-9; see also Hr'g Tr. (Jan. 29, 2015) at 31:3-9, 64:3-17, 76:21-77:6.

8

After supplemental briefing and additional oral argument on the illegality issues raised by the motion to dismiss, the bankruptcy court took the matter under submission and ultimately issued a seventeen-page ruling granting the motion to dismiss. In essence, the bankruptcy court concluded that the risks associated with the potential forfeiture of Medpoint's assets and with the trustee's inevitable violation of the Controlled Substances Act, 21 U.S.C. §§ 801, et seq., in the process of administering Medpoint's assets, justified dismissal of the involuntary petition under § 707(a). The court alternately concluded that dismissal was appropriate because the petitioning creditors who sought relief from the bankruptcy court all had unclean hands, because they knew or should have known that Medpoint's operations were illegal under federal law.

The bankruptcy court further ruled that Medpoint was not entitled to fees, costs or damages under § 303(i). The court discussed the fees and damages issues as a single topic. While the title the court gave to that discussion was "No Bad Faith," the introductory paragraph of that discussion identified the issue to be addressed as whether Medpoint should be awarded its fees, costs and damages under § 303(i)(1) and (2). There is no discussion of the fees, costs and damages issues anywhere else in the court's order.

The court cited the seminal Ninth Circuit case on the awarding of attorney's fees under § 303(i)(1), Higgins v. Vortex Fishing Sys., Inc., 379 F.3d 701, 707 (9th Cir. 2004), which requires bankruptcy courts to consider the totality of the circumstances. The bankruptcy court further noted that, if it

9

found bad faith, it also could award actual and punitive damages against the petitioning creditors under § 303(i)(2).

In reaching its decision to deny all fees, costs and damages, the bankruptcy court predominantly focused on the issue of bad faith. The court explained its reasoning as follows:

> The viability of an involuntary chapter 7 petition filed against a debtor on account of debts relating to state-licensed medical marijuana operations is a novel question of law in this District. The Court does not find that Petitioning Creditors' acted unreasonably in filing the Petition. The record shows that Medpoint is not and cannot meet its ongoing financial obligations to numerous creditors, in amount and number sufficient to justify an involuntary petition under section 303(b). The record before this Court does not contain facts to support a finding of Petitioning Creditors' bad faith. As the Ninth Circuit BAP has noted, "[n]ot every failed reason for filing an involuntary petition amounts to 'bad faith.'" In re Macke Int'l Trade, Inc., 370 B.R. 236, 257 (9th Cir. BAP 2007). Petitioning Creditors' unclean hands do not equate to a finding of their bad faith in this instance. Finding no bad faith, there is no need for a hearing on damages proximately caused by a filing that is not in bad faith.

Order Granting Motion to Dismiss (April 6, 2015) at 14:9-20.

The bankruptcy court entered its dismissal order on April 6, 2015, and Medpoint timely filed its notice of appeal.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (O). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

1. Did the bankruptcy court commit reversible error when it declined to award any attorney's fees against the petitioning creditors?

2 Did the bankruptcy court commit reversible error when it

10

determined that the petitioning creditors had not acted in bad faith, so Medpoint could not recover punitive damages against the petitioning creditors?

**STANDARDS OF REVIEW**

The bankruptcy court's denial of attorney's fees under § 303(i)(1) is reviewed for an abuse of discretion. Higgins, 379 F.3d at 705. The bankruptcy court's decision not to hold an evidentiary hearing also is reviewed for an abuse of discretion. Gray v. Warfield (In re Gray), 523 B.R. 170, 172 (9th Cir. BAP 2014). The bankruptcy court abuses its discretion if it applies an incorrect legal rule or its findings of fact are illogical, implausible or without support in the record. United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc).

The bankruptcy court's finding regarding the absence of bad faith is reviewed under the clearly erroneous standard. Wechsler v. Macke Int'l Trade, Inc. (In re Macke Int'l Trade, Inc), 370 B.R. 236, 245 (9th Cir. BAP 2007). The bankruptcy court's finding of fact is not clearly erroneous unless it is illogical, implausible or without support in the record. Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010).

**DISCUSSION**

Under § 303(i)(1), if an involuntary bankruptcy petition is dismissed, the bankruptcy court may award attorney's fees and costs against the petitioning creditors. Under § 303(i)(2), if the petitioning creditors filed the petition in bad faith, the court also may award actual and punitive damages.

**1.  § 303(i)(1) Analysis**

Section 303(i)(1) sets forth two exceptions to the right to

11

request attorney's fees upon dismissal: when the debtor waives the right to attorney fees or when all of the parties consent to the dismissal. In re Macke Int'l Trade, Inc., 370 B.R. at 251. We have refused to recognize additional exceptions and have, in essence, held that, aside from the exceptions referenced above, § 303(i) applies whenever an involuntary petition is dismissed, regardless of the grounds for dismissal. Id. at 251-53.

While the awarding of fees under § 303(i)(1) always is discretionary, id. at 252, the Ninth Circuit Court of Appeals has articulated a number of guidelines that bankruptcy courts in this circuit must follow in applying the statute. Bankruptcy courts are required to consider the totality of the circumstances. Higgins, 379 F.3d at 705. When relevant, the bankruptcy court's consideration must include the following factors, among others: "1) 'the merits of the involuntary petition,' 2) 'the role of any improper conduct on the part of the alleged debtor,' 3) 'the reasonableness of the actions taken by the petitioning creditors,' and 4) 'the motivation and objectives behind filing the petition.'" Id. at 707-08 (quoting In re Scrap Metal Buyers of Tampa, Inc., 233 B.R. 162, 166 (Bankr. M.D. Fla. 1999)). Accord, In re S. Cal. Sunbelt Developers, Inc., 608 F.3d 456, 462-63 (9th Cir. 2010).

While the Higgins court expressed the expectation that the above-referenced factors would be "definitive in most cases," the Higgins court also acknowledged that these factors are not meant to be exhaustive and that the bankruptcy court could exercise its discretion to consider other relevant factors. Higgins, 379 F.3d at 708.

12

The *Higgins* court held that its adoption of the totality of circumstances test did not abrogate the presumption that, upon dismissal, the petitioning creditors should be held liable for the fees the alleged debtor incurred in defending against the involuntary petition. *Higgins* explained the reasoning behind the presumption in the following manner:

> Although we adopt the totality of the circumstances test as the appropriate standard under § 303(i)(1), we do not abandon the premise that any petitioning creditor in an involuntary case should expect to pay the debtor's attorney's fees and costs if the petition is dismissed. . . . This [rebuttable] presumption helps reinforce the idea that the filing of an involuntary petition should not be lightly undertaken, and will serve to discourage inappropriate and frivolous filings. Filing an involuntary petition should be a measure of last resort because even if the petition is filed in good-faith, it can chill the alleged debtor's credit and sources of supply, and scare away his customers.

*Id.* at 707 (citations, ellipses and internal quotation marks omitted).

As the Ninth Circuit subsequently clarified, once the involuntary petition was dismissed, "[t]he burden was on [the petitioning creditor] to rebut the presumption by establishing that fees and costs were unwarranted under the totality of circumstances." *Sofris v. Maple-Whitworth, Inc. (In re Maple-Whitworth, Inc.)*, 556 F.3d 742, 746 (9th Cir. 2009); *see also Laxmi Jewel Inc. v. C&C Jewelry Mfg., Inc. (In re C&C Jewelry Mfg., Inc.)*, 2001 WL 36340326 at *14 (Mem. Dec.) (9th Cir. BAP Apr. 14, 2009) ("The presumption imposes on the petitioning creditors the burden of presenting evidence to meet the presumption, but it does not shift the burden of proof to the petitioning creditors.").

13

On appeal, there is no dispute between the parties that binding Ninth Circuit precedent required the bankruptcy court to apply the above-referenced standards in order to determine Medpoint's entitlement to recover its fees and costs. Rather, the parties disagree as to whether the court correctly applied these standards.

Medpoint claims that the bankruptcy court did not make findings indicating that it had considered the totality of the circumstances and did not acknowledge or apply the presumption that Medpoint was entitled to recover its attorney's fees. We agree. In light of the procedural posture of the case, we are convinced that the bankruptcy court could not have correctly considered the totality of the circumstances or correctly applied the requisite presumption because the parties never were given the opportunity to fully develop the evidentiary record. The bankruptcy court determined the fate of the involuntary petition based solely on the illegality under federal law of the cultivation and sale of marijuana and the risks arising from that illegality if a chapter 7 trustee were to administer Medpoint's bankruptcy estate. The court had before it the parties' papers in support of and in opposition to the dismissal motion, which included some evidence. The parties presented the court with a number of contracts and other documents, including Downing's declaration and the transcript from his deposition. While there was some evidence in these papers that might have enabled the court to make some inferences regarding the first Higgins factor – whether Medpoint was paying its debts as they came due – we are not persuaded that the court gave the parties sufficient

14

opportunity to present all of the relevant evidence on this issue. To the contrary, the court made it clear at the January 29, 2015 status conference and at the March 4, 2015 dismissal motion hearing that the merits of the involuntary petition only would be tried if the petition survived Medpoint's dismissal motion.

Additionally, the parties had no genuine opportunity to present evidence addressing the fourth Higgins factor – regarding the petitioning creditors' motivations and objectives in filing the petition. This factor requires the bankruptcy court to infer from the record the petitioning creditors' subjective state of mind in filing the petition. Higgins, 379 F.3d at 707; see also In re Macke Int'l Trade, Inc., 370 B.R. at 252-53 & nn. 13, 14 (reflecting on the purity of the petitioner's intentions and motives). The bankruptcy court was ill-equipped to make a finding regarding this factor given that the parties were instructed more than once to focus exclusively on the illegality issues raised in the dismissal motion. Obviously, some of the evidence presented during the course of the dismissal motion proceedings is relevant in determining the petitioning creditors' state of mind, but the limited scope of the dismissal motion proceedings doubtlessly kept the parties from presenting all of the relevant evidence.

Citing Jaffe v. Wavelength, Inc. (In re Wavelength, Inc.), 61 B.R. 614, 620 (9th Cir. BAP 1986), the bankruptcy court here applied an objective standard in the process of finding that the petition was not filed in bad faith. Under our own precedent, this was the appropriate standard for determining bad faith for

15

purposes of applying **§ 303(i)(2)**.  Id.; see also In re Macke Int'l Trade, Inc., 370 B.R. at 256-57 (following In re Wavelength, Inc. regarding the objective standard of bad faith).  However, for purposes of **§ 303(i)(1)**, the Higgins factors typically require the bankruptcy court to assess both the petitioning creditors' objective reasonableness as well as their subjective motives and intent.  Higgins, 379 F.3d at 707.  The bankruptcy court, here, made no explicit finding regarding the petitioning creditors' subjective motives and intent.  We sometimes can affirm in the absence of a required finding when the record is fully developed and when it gives us a full understanding of the controlling issues.  See Jess v. Carey (In re Jess), 169 F.3d 1204, 1208-09 (9th Cir. 1999); Swanson v. Levy, 509 F.2d 859, 860-61 (9th Cir. 1975).  But that is not the case here.  The record needs further development on the issue of the petitioning creditors' subjective motives and intent.

We acknowledge that Higgins indicates that bankruptcy courts ordinarily are not required to conduct a mini-trial on the alleged debtor's entitlement to attorney's fees if the court already has held a trial on the merits of the petition.  Higgins, 379 F.3d at 707.  Summary judgment or similar proceedings – where each side is given the opportunity to present evidence on the full range of relevant issues – also might sufficiently develop the record to obviate the need for a subsequent evidentiary hearing on the propriety of awarding attorney's fees.  See, e.g., In re Macke Int'l Trade, Inc., 370 B.R. at 242 (in the context of a motion to dismiss under § 305(a), both sides given opportunity to file declarations and briefs on the full range of relevant

16

issues); <u>In re C&C Jewelry Mfg., Inc.</u>, 2001 WL 36340326 at *3-4 (summary judgment proceedings held on the merits, followed by separate motion for § 303(i) fees and damages addressing issue of petitioning creditors' bad faith).

Nonetheless, given the specific procedural posture of this case and given the unique factual circumstances presented, the bankruptcy court could not have correctly considered the totality of the circumstances without further development of the record. Simply put, the bankruptcy court erred by not giving the parties the opportunity to present evidence pertaining to the full range of factors relevant to the application of § 303(i)(1).

**2.   § 303(i)(2) Analysis**

For the same reason, we also conclude that the court did not correctly apply § 303(i)(2).  As set forth above, our precedent requires the bad faith determination under § 303(i)(2) to focus on the petitioning creditors' objective reasonableness.  See <u>In re Macke Int'l Trade, Inc.</u>, 370 B.R. at 256-57; <u>In re Wavelength, Inc.</u>, 61 B.R. at 620.  The bankruptcy court, here, correctly referenced the objective reasonableness standard, and made a handful of findings in support of its conclusion that the petition was not filed in bad faith.  The bankruptcy court pointed out that the dispositive issue – the illegality under federal law of Medpoint's business – was a novel question of law. The court further inferred from the existing record that Medpoint was unable to "meet its ongoing financial obligations to numerous creditors, in amount and number sufficient to justify an involuntary petition under section 303(b)."  Order Granting Motion to Dismiss (April 6, 2015) at 14:13-14.

17

While there definitely is some evidence in the record to support the bankruptcy court's finding regarding Medpoint's financial difficulties, we nonetheless are troubled by this finding. The court more than once instructed the parties that the issue of whether Medpoint was generally paying its (undisputed) debts as they came due only would be addressed at a subsequent trial if the motion to dismiss was denied. This had a chilling effect on the parties' presentation of evidence pertaining to this issue. Therefore, as Medpoint has asserted, the bankruptcy court should not have denied Medpoint's request for an evidentiary hearing on its entitlement to damages under § 303(i)(2).

At bottom, the bankruptcy court enjoys considerable discretion in deciding whether to hold an evidentiary hearing, but that discretion is circumscribed by the requirements of due process. See Tyner v. Nicholson (In re Nicholson), 435 B.R. 622, 635-37 (9th Cir. BAP 2010), partially abrogated on other grounds by, Law v. Siegel, 134 S.Ct. 1188, 1196–98 (2014). We are aware of In re Nicholson's observation that "Bad faith is a 'highly factual determination' but does not generally require an evidentiary hearing." Id. at 637. Even so, due process necessarily requires that the parties be given **some** opportunity to present evidence on material disputed factual issues. The parties, here, were not given that opportunity.

### CONCLUSION

For the reasons set forth above, we VACATE the portion of the bankruptcy court's dismissal order denying Medpoint's request for fees, costs and damages, and we remand for further

18

proceedings.