**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | BAP No. CC-17-1002-STaL |
| BARAK MENASHE SNAPIR, | Bk. No. 2:12-bk-50058-BR |
| Debtor. | Adv. No. 2:13-ap-01334-BR |
| BARAK MENASHE SNAPIR, | |
| Appellant, | |
| v. | **MEMORANDUM**[*] |
| JANET BRELIANT, Trustee of the Breliant Trust Dated August 2, 1988, | |
| Appellee. | |

Argued and Submitted on September 29, 2017
at Pasadena, California

Filed – November 3, 2017

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Barry Russell, Bankruptcy Judge, Presiding

Appearances:    Patrick C. McGarrigle of McGarrigle, Kenney &
Zampiello, APC argued for appellee.

Before: SPRAKER, TAYLOR, and LAFFERTY, Bankruptcy Judges.

---

[*]This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1.

**INTRODUCTION**

The bankruptcy court entered judgment against chapter 7[1] debtor Barak Menashe Snapir excepting from discharge his debt arising from his fraudulent procurement of funds from appellee Janet Breliant, trustee of the Breliant Trust Dated August 2, 1988. Snapir appeals from that judgment.

In virtually all of his arguments on appeal, Snapir in essence challenges the bankruptcy court's findings. Because there was sufficient evidence to support the bankruptcy court's key findings, we AFFIRM the bankruptcy court's nondischargeable fraud ruling under § 523(a)(2)(A).

Snapir also challenges the bankruptcy court's award of prejudgment interest at the rate specified by California law. The bankruptcy court gave no reason for departing from the federal interest rate, which generally applies to nondischargeability claims. Therefore, we VACATE this aspect of the bankruptcy court's ruling, and we REMAND so that the bankruptcy court can recalculate prejudgment interest at the federal rate, or, alternately, make the requisite findings and provide the reasoned justification necessary to support application of the California interest rate.

**FACTS**

In September 2008, Breliant entered into a home improvement contract with Snapir's wholly-owned corporation, Castle Homes,

---

[1]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

Inc.[2]  According to Breliant, her project designer, Roy Sklarin, encouraged her to hire Snapir as her general contractor for the project.  Sklarin represented to Breliant that Snapir was part of his team, and that Sklarin and Snapir had been working together on home improvement projects for 25 years.  Breliant insisted that Snapir was present when Sklarin made the above-referenced representations, and Snapir acknowledged and ratified each of them by, among other things, nodding his head in assent as Sklarin made them.  Before Breliant signed the contract, she asked Sklarin to show her an example of their work.  Sklarin and Snapir took Breliant on a tour of a whole-house remodel of a large estate, which was similar in size to Breliant's residence. Impressed with this example of Sklarin's and Snapir's work, Breliant signed their home improvement contract.

Snapir concedes that Sklarin's representations to Breilant were untrue.  Snapir admitted that his contracting projects, prior to Breliant's, typically consisted of room additions or bath and kitchen remodels in smaller, middle-class homes; he never had attempted as big a remodeling project on as large (or high end) a residence as Breliant's.  He further conceded that he never worked with Sklarin prior to the Breliant project and did not work on the remodel of the house shown to Breliant to convince her to hire them.  But, Snapir maintained that he did not hear Sklarin make any of the above representations to

---

[2]At all relevant times, Breliant was acting in her role as trustee of the Breliant Trust Dated August 2, 1988.  For ease of reference, we refer to Breliant herein, in her capacity as trustee, by her last name.

3

Breliant. He insists that he never acknowledged or ratified any of Sklarin's misrepresentations.[3]

The contract provided for extensive remodeling and renovation of Breliant's residence located in Beverly Hills, California. The original contract price was $802,000, but Breliant later requested a series of changes and additions to the project that resulted in the issuance of "change orders," which almost doubled the contract price to roughly $1.45 million.

Over the course of two years, between September 2008 and September 2010, Breliant paid Snapir, in aggregate, roughly $1.3 million.[4] The remodel, however, remained far from complete. Snapir would prepare invoices and change orders and deliver them directly to Breliant or to Sklarin, who would present them to Breliant for payment. Breliant then would make her checks payable to Castle Homes or to Snapir's successor corporation, U.S. Builders, and would give the checks to Sklarin, who would deliver them to Snapir.

Unbeknownst to Breliant, Sklarin would not release Breliant's checks to Snapir unless and until Snapir gave him a

---

[3]At trial, the parties presented their direct testimony by declaration, but neither party's excerpts of record included Snapir's trial declaration. Nonetheless, we have reviewed this trial declaration and other adversary proceeding documents not provided by the parties by accessing the bankruptcy court's electronic docket. We can take judicial notice of its contents and of the imaged documents attached thereto. Elliot v. Weil (In re Elliott), 544 B.R. 421, 423 n.3 (9th Cir. BAP 2016), aff'd, 2017 WL 2570014 (Mem. Dec.) (9th Cir. June 14, 2017) (citing O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957–58 (9th Cir. 1988)).

[4]Breliant also paid separate amounts to Sklarin for his design work, which amounts are beyond the scope of this appeal.

4

check for 5% of the amount Breliant paid. Sklarin later increased this percentage to 10%. Whereas Snapir referred to these amounts as commissions or payments, Breliant, when she later learned of this practice, referred to the payments as kickbacks. Breliant stated that had she known about the kickbacks, or that Snapir had no prior experience working with Sklarin, or that he had not previously worked on high-end whole house remodels, she would not have done business with Snapir.

But the most critical misrepresentations, in terms of Breliant's damages, were those implicit in the invoices and change orders Snapir caused to be presented to Breliant for payment. As Breliant put it, Snapir presented these invoices "for work he claimed was done and/or near completion." Breliant Tr. Decl.[5] By way of his invoices and change orders, Snapir fraudulently induced Breliant to make payments for labor and materials she thought had been provided, but much of it actually never was provided.

---

[5]The parties at trial did little or nothing to differentiate between invoices and change orders. In fact, Breliant generally referred to them all as invoices. See Breliant Tr. Decl. (Sept. 28, 2016) at ¶ 7 & Ex. 2; see also Snapir Tr. Decl. at ¶¶ 20-21 & Ex. L. As a practical matter, Sklarin and/or Snapir were presenting the change orders to Breliant as if they were invoices. Snapir, for his part, claimed that he never represented in any change order that the labor and materials described in the change order already had been supplied. However, he admitted that he was aware that Sklarin was presenting the change orders to Breliant for payment and that he received the lion's share of the payment proceeds. He attempted to deflect any responsibility or liability for this practice by asserting that Sklarin was calling the shots and that he could not prevent Sklarin from presenting the change orders for premature payment. But he indisputably acquiesced to Sklarin's conduct and knowingly accepted the benefits therefrom.

5

A little less than two years into the project, after paying $1.3 million to Snapir and with completion of the project lagging, Breliant was confronted with demands for additional payments from Snapir and Sklarin. These demands caused Breliant concern, as Snapir and Sklarin did not offer Breliant any specific or credible assurances as to when the project would be completed or how much more they would require her to pay. Breliant then hired a construction consultant, Mike Sawyer, who determined that Breliant had paid Snapir hundreds of thousands of dollars for work that had not been performed. Based upon his review of the project, Sawyer calculated the amount of funds paid for work not completed to be at least $582,000. Sawyer testified that Snapir himself had admitted to him that he had received more than $340,000 in payments that Breliant made for work not completed. After Breliant, with Sawyer's support, refused to pay more, Snapir refused to complete the remodeling project. Breliant ultimately hired a different contractor who completed the work Snapir was supposed to have finished for $615,074.59.

Both Sklarin and Snapir eventually commenced separate bankruptcy cases.[6] Breliant obtained a $1.3 million nondischargeability judgment against Sklarin in his bankruptcy case, and then she tried her § 523(a)(2)(A) and (a)(6) nondischargeability claims against Snapir. The bankruptcy court granted judgment against Snapir on both claims. The bankruptcy

---

[6]The record indicates that, before Snapir's bankruptcy filing, Breliant sued Snapir in state court for fraud, unjust enrichment, etc. There is nothing in the record indicating how (or whether) the state court litigation was disposed of.

6

court found Breliant's and Sawyer's testimony to be credible. The bankruptcy court did not find Snapir credible. It also noted that the parties' testimony differed completely and commented that much of Snapir's version of events did not make any sense.

The bankruptcy court specifically found that Breliant had proven each of the elements of her claim under § 523(a)(2). The court noted that Snapir had knowingly made false representations to induce Breilant to execute the contract and then fraudulently misrepresented his right to payments. It also found that Breilant justifiably relied on Snapir's and Sklarin's representations to enter the contact and on the invoices and change orders in paying for labor and materials supposedly but not actually provided. The bankruptcy court held that, as a direct, proximate and foreseeable result of Snapir's fraud, Breliant incurred damages in the amount of the replacement performance totaling $615,074.59. The bankruptcy court also awarded Breilant prejudgment interest of $215,276.10 calculated under California law.

As for Breliant's § 523(a)(6) claim, the bankruptcy court found that Snapir's injury to Breilant was both willful and malicious as those terms are defined for purposes of § 523(a)(6).

The bankruptcy court entered its nondischargeability judgment on December 22, 2016, and Snapir timely appealed.

## JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I), and we have jurisdiction under 28 U.S.C. § 158.

7

## ISSUES

1. Did the bankruptcy court err when it entered judgment in favor of Breliant on her nondischargeability claims under § 523(a)(2)(A) and (a)(6)?

2. Did the bankruptcy court err when it awarded Breliant prejudgment interest at the rate provided under California law?

## STANDARDS OF REVIEW

In nondischargeability appeals, we review the bankruptcy court's findings of fact under the clearly erroneous standard and its conclusions of law de novo. Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 28 (9th Cir. BAP 2009), aff'd, 407 F. App'x 176 (2010). A finding of fact is not clearly erroneous unless it is illogical, implausible or without support in the record. Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010).

We review the bankruptcy court's award of prejudgment interest for an abuse of discretion. See Grosz-Salomon v. Paul Revere Life Ins. Co., 237 F.3d 1154, 1163–64 (9th Cir. 2001). In applying the abuse of discretion standard, we review de novo whether the bankruptcy court identified and applied the correct legal rule, and we review factual findings for clear error. See United States v. Hinkson, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc).

## DISCUSSION

Snapir contends that Breliant failed to prove that his debt to her was nondischargeable under either § 523(a)(2) or (6). Additionally, he argues that it was error to award prejudgment

8

interest under California law rather than under the applicable federal rate. We address these issues in turn.

**A.    Breliant's § 523(a)(2)(A) Claim**

In relevant part, § 523(a)(2)(A) excepts from discharge debts for money, property or services "obtained by false pretenses, a false representation, or actual fraud . . . ." Under this Code provision, the debtor's liability for money, goods or services fraudulently procured is nondischargeable if the plaintiff establishes the following elements by a preponderance of the evidence:

> (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.

Sabban v. Ghomeshi (In re Sabban), 384 B.R. 1, 5 (9th Cir. BAP 2008) (quoting Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman), 234 F.3d 1081, 1085 (9th Cir. 2000)). The bankruptcy court correctly recited these five elements. Snapir argues on appeal that the bankruptcy court erred because he never misrepresented his qualifications or work experience to Breliant and always intended to perform. There was evidence in the record sufficient to support the bankruptcy court's findings on these matters.

**1.    Snapir's False Representations**

Snapir argues that he never made misrepresentations to fraudulently induce Breliant to do anything. First, Snapir argues that neither he nor Sklarin misrepresented his "ability" to perform as he was always able to construct the house as

9

contracted. This argument misses the point that Snapir induced Breliant to enter into the contract by misrepresenting: (1) that the two of them had been working together for 25 years; and (2) that Snapir had worked on high-end remodeling projects, including the one Breliant toured before entering into the home remodeling contract with Snapir. Both representations were false, and the evidence supports the bankruptcy court's finding that they were made for the purpose of inducing Breliant to enter into the remodeling contract with Snapir.

Snapir next argues that it was Sklarin alone who misrepresented his experience and involvement with Sklarin. However, the bankruptcy court rejected this argument. The bankruptcy court found credible Breliant's testimony that Snapir acknowledged and confirmed Sklarin's misrepresentations by nodding his head in assent during the first meeting between Snapir, Sklarin and Breliant. Snapir furthered the misrepresentation by accompanying Sklarin on the tour of the model house represented as an example of their work immediately before she entered into the contract. The court further found that Snapir knowingly, intentionally and actively participated in the fraud. The record supports these inferences. Snapir presents no argument as to why this is clear error apart from his disagreement with the court's finding.

Snapir's arguments also ignore the bankruptcy court's conclusion that Snapir fraudulently misrepresented the work that he had performed and completed to obtain payments to which he was not entitled. Snapir admitted that he prepared the invoices, and he either gave them directly to Breliant or to Sklarin, knowing

10

that Sklarin was presenting them to Breliant for payment, even though much of the work described therein was nowhere near completion. Snapir directly benefitted from this conduct by his receipt of hundreds of thousands of dollars for work not performed.

In short, the bankruptcy court chose to believe Breilant's version of the evidence rather than Snapir's. Its findings that Snapir misrepresented his work experience overall, and the status of his work, were logical, plausible and supported by the record. See In re Retz, 606 F.3d at 1196.

## 2. Snapir's Intent to Perform

Snapir argues on appeal that there was no fraud, that he always intended to perform under the remodeling contract and that he only was prevented from fully performing by forces beyond his control. Specifically, he refers to Breliant's numerous alterations and additions to the project which he believes caused inordinate delay and unmanageable costs. Put another way, Snapir argues that his partial, but incomplete, performance establishes his general intent to perform and defeats Breilant's claim of fraud by false promise.

Partial performance, under the right circumstances, can be persuasive to counter a false promise allegation. See, e.g., Wagner v. Malich (In re Malich), 2011 WL 3300818, *7 (Mem Dec.) (9th Cir. BAP Mar. 15, 2011); see also In re Khalil, 2017 WL 1485464, *3 (C.D. Cal. Apr. 20, 2017) (stating that failed attempts to perform could support a finding of intent to perform and thereby defeat a promissory fraud claim). Nonetheless, this contention is wholly unpersuasive here because the bankruptcy

11

court's fraud determination was not based on a false promise. Indeed, the bankruptcy court even commented that Snapir probably subjectively wanted to finish the project, but was far out of his depth and without the ability to do so. Instead, the bankruptcy court was clear that the misrepresentations regarding Snapir's work experience constituted fraud from the inception of the project, which fraud continued when he misrepresented the work completed in the invoices and change orders to procure payments to which he was not entitled. The bankruptcy court found that these representations – not a false promise – induced Breliant to pay hundreds of thousands of dollars for work not performed and that she suffered damages in the amount of $615,074.59 as a result. Any intent to perform did not negate Snapir's fraudulent inducement of the contract or the unearned payments Breliant paid under it.[7]

## B. The Applicable Prejudgment Interest Rate

Snapir's only other argument on appeal asserts that the bankruptcy court applied the wrong legal standard for calculating prejudgment interest. The bankruptcy court applied a prejudgment interest rate under California law of 7% per annum based on Cal. Civ. Code § 3287(a) and under Cal. Const., Art. 15, § 1. According to Snapir, the bankruptcy court should have applied the federal interest rate provided for in 28 U.S.C. § 1961(a). See generally Blankenship v. Liberty Life Assur. Co. of Boston, 486 F.3d 620, 628 (9th Cir. 2007) (postjudgment interest rate

---

[7]Because we are affirming the bankruptcy court's nondischargeability judgment under § 523(a)(2)(A) we decline to address Breliant's alternate claim for relief under § 523(a)(6).

12

prescribed under 28 U.S.C. § 1961 should be applied to ERISA judgment to award prejudgment interest "unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate").

Breliant contends that California law determines the prejudgment interest rate because her nondischargeability lawsuit was based on her home improvement contract with Snapir, and the contract provided for the application of California law.[8] However, Breliant did not sue to enforce her contract. Instead, she claimed nondischargeable damages resulting from Snapir's fraud as well as willful and malicious injury. The court excepted the debt from discharge under § 523(a)(2) and (6) based upon its finding of such fraud. Neither the arguments presented at trial nor the bankruptcy court's decision suggest that the judgment for nondischargeability was based on a mere breach of contract.[9]

For claims brought under federal law, including the

[8]Breliant alternately argues that the bankruptcy court should have applied against Snapir an 18% interest rate because the home improvement contract provided for past due payments to accrue interest "at the rate of 1.5% per month (18% per annum)." Because Breliant did not file a cross-appeal from the bankruptcy court's nondischargeability judgment, we will not address this argument.

[9]Nondischargeability of a contract claim under § 523 is subject to additional scrutiny which is not reflected in the record below. See Lockerby v. Sierra, 535 F.3d 1038, 1041 (9th Cir. 2008) (citing Petralia v. Jercich (In re Jercich), 238 F.3d 1202, 1206 (9th Cir. 2001)); see also Dourbetas v. Gionis (In re Gionis), 2009 WL 7751433, at *8 (Mem. Dec.) (9th Cir. BAP Apr. 30, 2009) (stating that neither breach of contract nor mere negligent misrepresentations will, by themselves, support a § 523(a)(2)(A) claim).

13

Bankruptcy Code, the interest rate prescribed by federal law applies unless the equities require a different interest rate. Banks v. Gill Distrib. Ctrs., 263 F.3d 862, 871 (9th Cir. 2001)(analyzing award of prejudgment interest on § 523(a) claims). Any departure from this standard based on the equities requires "reasoned justification" supported by "substantial evidence." Id.; Blanton v. Anzalone, 813 F.2d 1574, 1576 (9th Cir. 1987); see also Palm Fin. Corp. v. Eberts (In re Eberts), 607 F. App'x 683, 686 (9th Cir. 2015) (holding that bankruptcy court properly applied federal interest rate because the plaintiff based its claim on § 523(a)(2)(A) and the plaintiff did not argue that the equities warranted application of the state interest rate instead).

Here, the bankruptcy court gave no reason for departing from the federal interest rate. Accordingly, the bankruptcy court's award of prejudgment interest must be vacated and this matter must be remanded. On remand, the bankruptcy court must either apply the federal interest rate recalculated in accordance with 28 U.S.C. § 1961 or provide a reasoned justification supported by substantial evidence for departing from the federal interest rate. See Blanton, 813 F.2d at 1576; see also Melikyan v. Khnkoyan (In re Melikyan), 263 F. App'x 631, 635 (Mem. Dec.) (9th Cir. Jan 16, 2008) (remanding either for recalculation of prejudgment interest or for a "reasoned justification" for departing from the federal interest rate).[10]

---

[10]Breliant's response brief on appeal discussed the bankruptcy court's finding that Snapir was the alter ego of his

(continued...)

14

**CONCLUSION**

For the reasons set forth above, we AFFIRM the bankruptcy court's judgment excepting Snapir's debt from discharge under § 523(a)(2)(A). However, we VACATE the court's award of prejudgment interest. We REMAND for further proceedings consistent with this decision.

---

[10](...continued) wholly-owned corporations, Castle Homes and U.S. Builders. Snapir did not address or even mention the alter ego issue in either his opening appeal brief or in his reply. We therefore decline to address the issue. See Christian Legal Soc'y v. Wu, 626 F.3d 483, 487–88 (9th Cir. 2010) (declining to address matters not specifically and distinctly discussed in the appellant's opening brief); Brownfield v. City of Yakima, 612 F.3d 1140, 1149 n.4 (9th Cir. 2010) (same).

15